DOUGLASS & VARNUM *v.* VILLAGE OF MORRISVILLE.

November Term, 1913.

Present: MUNSON, WATSON, HASELTON, AND TAYLOR, JJ., AND WATERMAN, SUPERIOR J.

Opinion filed October 26, 1915.

*Municipal Corporations—Authority of Agents—Evidence of Agency—Construction—Contracts—Ambiguous Phrases—Questions for Jury—Compensation for Extra Work—Delay in Performance—Waiver—Interpretation of Written Contracts—Admissibility of Parol Evidence—Experts—Examination—Opinion Evidence—Subject of Expert Testimony—Scope of Cross-examination—Remarks of Counsel—Harmless Error.*

In an action on a written contract for the construction of a concrete dam, providing that the price, which was a "lump sum," "must cover the total expense of securing a proper foundation and building the work specified to lines and levels and in the manner called for in the plans and specifications," and that the work must conform exclusively to designated "plans and drawings," where it appeared that on the designated plans was a drawing, "Profile Across River at Dam," whereon was a line representing the surface of the river bottom with the elevations thereof at intervals of 20 or 25 feet, and plaintiffs' evidence tended to show that the word "levels" as an engineering term meant elevations, that the "lines and levels" to which reference was made included the profile line and the elevations thereon, and that the plans showed the river bottom to be solid rock, requiring practically no excavation below the profile line, on which, as plaintiffs' evidence tended to

show, they required the dam to be founded, and that the contract price did not include the excavation and filling with concrete of a pocket or fissure in the river bottom below. that line, while defendant claimed and its evidence tended to show, that the work of excavating and filling the fissure was not extra work but was exacted by the contract, which required the dam to be constructed on solid rock, wherever found, and there was parol evidence of the circumstances in which the contract was executed, and that the conversations and acts of the parties, and their contemporaneous and subsequent practical construction of the contract was in accordance with plaintiffs' contention. *Held* that, although no ambiguity appears on the face of the contract, a latent ambiguity, consisting in the equivocal or uncertain meaning of the phrase, "to lines and levels and in the manner called for in the plans and specifications," was raised by extrinsic evidence, and so it was for the jury to say whether the parties understood the contract as claimed by plaintiffs.

In an action for extra work under a written contract with a village for the construction of a concrete dam, which provided that extra work must be covered by an order in writing, where the evidence tended to show that plaintiffs and the agents of the village, with whom the contract was made in its behalf, understood that the foundation of the dam was to be constructed substantially on the bed of the river, and that such agents must have known that the excavation and filling of a fissure in the river bottom, found necessary because it was filled with a substance unsuitable for the foundation of a dam, was not covered by the contract, nor by any order in writing, but was covered by a verbal order of their inspector, but they made no objection to that work and subsequently accepted the benefit thereof, that in many other instances extra work was done under only the verbal directions of the inspector, no instance of a written order being shown, the finding that there was a general waiver of the requirement of a written order covering extra work was warranted, as such waiver may be inferred from an order to do extra work in circumstances such as imply a promise to pay therefor.

Under a written contract with a village for the construction of a dam, which provided that extra work must be covered by an order in writing and should be paid for at actual cost plus 10 per cent., where the village waived the requirement for such order in writing, the remainder of the provision as to extra work was in full

force and constituted an express promise to pay for extra work, covered by any order from a proper source, at actual cost plus 10 per cent.

In an action against a village on a contract to build a dam and penstock in connection with its power plant, where defendant claimed that plaintiffs failed to install a required clean-out gate in the old plant, that the penstock for 200 feet was out of the required grade and level, that surplus excavated material placed around and over the penstock was not tamped and puddled as required, that much of the penstock was covered with frozen material, and that the penstock was lined with concrete instead of with asphalt, as required, and there was evidence that plaintiffs acted in good faith in failing to install the gate, and were delayed in so doing till after the water had been turned into the penstock and possession of the plant taken by defendant, after which it was not practical to do the work, that defendant never offered to shut down the plant, nor mentioned the gate, till after plaintiffs understood the work was completed, that defendant's inspector knew the gate had not been installed and how the work was being done in other respects, but made no objection thereto, and that, with full knowledge of plaintiffs' failure strictly to perform, defendant voluntarily accepted the work, took possession and had the beneficial use thereof, a verdict should not be directed for defendant because of plaintiffs' failure strictly to perform the contract.

Where, after the time fixed by the contract for the completion of the dam, defendant allowed the work to go on as before, with its inspector in charge thereof, treating the contract as still in force, it waived strict performance as to time; and, though it might have been entitled to recoup for the damages suffered by the delay, the delay could not defeat the contractors' right of recovery.

Several remarks by plaintiffs' counsel *held* either not objectionable or harmless to defendant.

Defendant cannot complain of remarks by plaintiffs' counsel which were provoked by an improper discussion by defendant's counsel of an objection to evidence.

In an action on a contract for the construction of a dam, where plaintiff claimed that it was understood that the river bottom was bed rock, and that a line in the plans representing that bottom was understood to indicate the bottom line of the construction, while defendant claimed that the foundation should go to solid rock, wherever that might be found, an expert civil engineer and build-

ing contractor, who in connection with work similar to that in question had been called upon to examine plans, specifications, and contracts to determine the work to be done, was properly allowed to examine the plans and specifications and to express the opinion that the line representing the profile of the river bottom was the line of the bottom of the excavation for the dam.

An expert, who testified that in his opinion the profile line was the line of the bottom of the excavation, and was asked on cross-examination whether the plans indicated the quality of the river bottom, and answered that any one who saw the plans without seeing the location might be in doubt, was properly allowed on redirect examination to state what, if anything, there was in the site to leave one who had seen it without doubt.

The court, in its discretion may allow an irresponsive but material answer to stand.

On the issue of whether a sketch of a cross-section of the dam, shown on the plans, was intended as a typical cross-section, or only as a cross-section of the dam at a particular point, a civil engineer of long experience was properly allowed to testify that it seemed to be a typical section, over the objection that he should be asked what the plan said the section was, as his answer was only another way of saying that in his opinion the section was a typical section.

An expert, having testified for plaintiffs that a cross-section of the dam shown on the plans seemed to be a typical cross-section, and who was asked on cross-examination concerning what the plans indicated as to requiring bedrock for the foundation of the dam, and whether there was anything in the plans, in the profile line. or in the typical section, to indicate the character of the ground along the profile line, was properly asked on redirect examination whether he had seen the situation in question, whether from that and from his experience and knowledge as an engineer he could tell what was the surface of the ground along the profile line, and whether from the typical section and the diagram on which the profile line appeared he could tell what the surface of the river bottom was represented to be.

Where there was a dispute as to the meaning of the word "levels" in a provision of a construction contract that the work was to be built "to lines and levels in the manner called for by the specifications," plaintiff, a civil engineer of long experience, was properly allowed to testify that the figures along the profile line indicating

levels were to be taken as exact, and being thereupon reminded by his counsel that he had testified that, assuming the bottom of the river to be bedrock, there was expected to be loose material upon the surface which would be swept off, and asked whether any deduction had to be made for this, or whether it was taken into consideration in arriving at the figures placed on the plan, he was properly allowed to answer that the levels, or elevations, meant to him the deepest soundings taken to bedrock, and that the foot or six inches, or whatever it might be, was above those levels, and that, in arriving at the quantity of excavation for which plaintiffs claim, no deduction was to be made from the quantity of excavation below the base line.

Where a contract with a village for the construction of a dam authorized the inspector for the village to give orders and directions concerning designated matters, and provided that designated parts of the work should be done to his satisfaction, the authority thus expressly given carried with it, by necessary implication, authority to do all acts that might be necessary for the purpose of effecting the objects for which the express authority was given.

In an action against a village on a contract for the construction of a dam and a steel penstock for use in connection therewith, evidence as to directions concerning the work given by an inspector in charge of the work for the village, was admissible on the question of his agency for the village, as agency need not necessarily be established by direct evidence, but may be proved by circumstances; and while the mere fact that a person assumes to act as agent for another is not sufficient to show agency, if his acts are so open and notorious that they must have been known to the one for whom he assumed to act, they are evidence of agency.

The testimony of a manufacturer, who installed the penstock at the dam in question under a contract with plaintiffs, as to discussing the work with the inspector, that he sent specifications of the penstock to the inspector, and delivered them to him in the presence of two of the water and light commissioners, that they all talked the matter over, and he left the specifications there and never saw them again nor furnished any others, was admissible on the question of the inspector's agency for the village, and it was immaterial that what took place between the witness and the inspector regarding the specifications was before the contract between plaintiffs and the village was made, it appearing that, before that contract was made, the inspector was acting for the

village in connection with the matter of constructing a dam, and it being inferable that the specifications were received by the commissioners with knowledge of what the inspector had done in respect of their procurement.

In an action against a village on a contract. for. the construction of a dam, involving a question as to the extent of the inspector's agency for the village, where a witness testified without objection that he furnished specifications for a penstock to the inspector "representing the village I supposed," an exception to his subsequent testimony that he supposed he furnished them to the village was without force, as this testimony was in substance the same as his previous testimony.

In an action against a village to recover for alleged extra work under a contract for the construction of a dam, the testimony of one of the village water and light commissioners that, while the work in question was being done, he understood that plaintiffs understood that they were doing the work because it was required by the contract to be done, was properly excluded as the opinion of the witness, where no foundation had been laid by proving the facts from which witness arrived at his conclusion as to plaintiffs' understanding.

In an action against a village on a contract for the construction of a dam providing that the contract price "must cover the total expense of securing a proper foundation and building the work specified to lines and levels and in the manner called for in the plans and specifications," where there was a dispute as to whether a line representing the river bottom appearing on a "Profile Across River" in the plans was the bottom line of the construction, and whether excavation below such line, made necessary by the discovery of a fissure containing matter unsuitable for a foundation, was covered by the contract, or was extra work, on the questions whether the parties gave a contemporaneous and subsequent practical construction of the contract, and whether it was on that understanding that plaintiffs made their estimate, a witness was properly allowed to testify that he assisted plaintiffs in arriving at the estimate of the expected cost of the work, and that he therein consulted such profile.

It appearing that such engineer was present when defendant's engineer made soundings of the river bottom through the ice, he was properly permitted to testify that when he made the soundings he supposed he struck rock bottom at every sounding, the result of

his investigations having been communicated to plaintiffs and by them taken into consideration in making their bid.

The order of the reception of evidence is within the discretion of the trial court.

In a suit against a village for alleged extra work under a contract for the construction of a dam, which provided that any extra work should be paid for at actual cost plus 10 per cent., evidence as to the rental value of machinery such as plaintiffs used in the claimed extra work was properly admitted against the objection that there was no evidence that plaintiffs used any other or different machinery than they had there for the work they expected to do, as reasonable compensation for the use of the machinery was a matter to be considered in determining the actual cost of the extra work.

In an action against a village on a contract to recover for alleged extra work in excavating and filling a fissure containing a substance unsuitable for a foundation for a dam, where plaintiffs claimed that it was understood by both parties that the bed of the river was rock bottom, that the actual condition could not have been discovered in advance without experimenting at disproportionate expense, and that the plans showed that a line indicating the river bottom was to be the bottom line of the construction, a witness was properly allowed to testify that during the work he and others went out into the stream and made soundings to discover a place suitable for a cofferdam, and that they found the bottom to be what they called rock bottom.

Testimony that plaintiffs looked the site over before making their bid, that in making it they took into consideration what they had observed, and that, from their observation and the information they then obtained, they concluded the bottom of the river was rock, was properly admitted on the question of what means plaintiffs took to ascertain the character of the river bottom and how the plans were understood by the parties when the contract was executed.

One of the plaintiffs having testified that before bidding, at a meeting with defendant's water and light commissioners, he was shown the plans and certain notes regarding the dam, he was properly allowed further to testify, against the objection that the notes were the best evidence of what they were, that he understood the notes to be the elevations and soundings taken by defendant's engineer at the site of the dam; as showing that plaintiff, in addi-

tion to a view of the site and an examination of the specifications, had also, as a guide to aid him in determining what he might do, what was represented to him as being the notes of the engineer who made the plans.

Where no ground of an objection to the admission of evidence is stated below the only question on review is whether the evidence was material or relevant in any state of the case.

In an action against a village on a contract for the construction of a dam, where plaintiffs claimed that a provision that the work should be built "to lines and levels * * * called for by the plans and specifications" meant a line, with the elevations thereon, shown on the plans and representing the river bottom, and that excavation below that line was, therefore, extra work, evidence that, at a meeting with the village water and light commissioners before plaintiffs made their bid, there was a general discussion concerning the river bottom, and that it was then said to be rock, and that said line was referred to as being the base line, or line above which the foundation of the dam was to be built, was admissible, for although oral evidence is not admissible to enlarge, vary, or contradict the terms of a valid written contract, such contract is to be read in the light of the surrounding circumstances and considered with reference to its object, and the parol evidence rule is not infringed by admitting oral evidence to explain a latent ambiguity.

Evidence that during the progress of the work the village water and light commissioners were present at different times, and that once two of them, being less than a majority, in company with the inspector in charge of the work for the village, ordered designated changes in the work, was admissible to show the commissioners' knowledge of the conditions making the extra work necessary, for knowledge by, or notice to, an agent while acting for his principal, of facts affecting the transaction, is notice to the principal.

Evidence *held* sufficient to show that the inspector in charge of the work for the village was the authorized agent of the village water and light commissioners in whatever he did by way of ordering extra work and materials, or in connection therewith.

Declarations of the water and light commissioners while on the work for the purpose of giving orders respecting changes in the work were admissible as a part of the *res gestae*.

In an action on a contract for the construction of a dam, to recover

for extra work consisting of excavating a fissure in the river bottom and filling it with concrete, testimony that the condition of the river bottom could not, without actual experiments, have been determined before the work was begun, and that plaintiffs did not in fact know where they would find bedrock until they struck it, was admissible on the question of whether there was a waiver of the requirement of the contract that extra work should be covered by an order in writing.

Testimony of a civil engineer that the condition of the river bottom could not have been discovered without actual experiments did not relate to a matter about which the jury could judge as well as the witness.

In an action against a village on a contract for the construction of a dam, to recover for extra work consisting of excavating a fissure in the river bottom and filling it with concrete, where it appeared that the contract provided that monthly the village should make an estimate of the proportionate value of the work done and that the amount thereof, less 15 per cent., should be then due plaintiffs, and one of plaintiffs testified that he made some request of defendant's engineer, who was about to make such monthly estimate, in reference to the work done in the fissure, and that the engineer promised to consider it, the witness was properly allowed further to testify that the engineer subsequently stated that he had considered it, where it appeared that he did not include that work in the monthly estimate; as his statement that he had considered that work was a declaration made in connection with an act done in the course of his agency and tending to explain his omission of that work from the monthly estimate, and was admissible on the question of whether that work was extra work, and also to show notice to the engineer that plaintiff was claiming pay for it as extra work, which would be notice to the village.

On the issue as to whether a line, shown in the plans on a profile of the river bottom, was understood to indicate solid rock and to be the bottom line of the construction, where one of plaintiffs was asked on cross-examination why, if a cross-section of the dam, shown on the plans, required him to go to solid rock, they did not have to go to solid rock along the whole length of the spillway, his answer that nothing on that page of the plans made any difference, that the whole plan told him to go to rock, and that the profile line showed that they would find rock at the levels marked thereon, was responsive.

26

In an action on a contract for the construction of a dam which required the work to be built "to lines and levels and in the manner called for in the plans and specifications," involving a dispute as to whether excavating and filling below a line, shown in the plans on a profile of the river bottom, was extra work, testimony of one of plaintiffs, as to the points or lines between which he estimated the yardage of the work before bidding, was admissible as bearing on the question of plaintiffs' understanding of the plans and specifications, and on the question of whether the parties gave contemporaneous construction of the contract.

The court properly ruled that a civil engineer, called by defendant to testify regarding the possibility of determining the character of the river bottom in advance, and who testified that he had read of, but had never used, the "wash-boring" method of determining the character of river bottoms, was not competent to express an opinion as to the feasibility of using that method in a locality filled with a particular kind of material, where it did not even appear whether he had read of that method in some scientific book or in some periodical publication.

Defendant's offered testimony of an expert civil engineer that it would be "very foolish" to require that a dam should be built along the profile line shown on the plans, assuming that it was the profile of the surface of the river bottom, was properly excluded, as the characterization of such a requirement was not a matter of expert testimony.

An expert civil engineer having testified for defendant that, if the profile line was intended to be a grade line on which to found the dam, anything going below that line would be shown by a dotted line, and that, if he had been drawing the plans on the theory on which defendant claimed they were drawn he would draw them as the plans in question were drawn, he was properly cross-examined as to whether, if he wanted to provide for the unexpected, he would put on the plans and specifications something about what might be discovered, and indicate something as to bids on that basis, and as to whether a few nights before he had not told the cross-examiner that it was witness's custom to provide in the plans and specifications that the bidder should name the price for anything below the line in case it should be found necessary.

The exclusion of an exhibit that is not furnished on review will not be considered.

In an action against a village to recover for alleged extra work under a contract for the construction of a dam, one of the village water and light commissioners having testified for defendant that plaintiffs' bid, though the lowest, was considered too high,. and that an effort was made to reduce the cost of the dam without impairing its efficiency, and for that purpose a meeting was had with one of plaintiffs, was properly cross-examined as to whether he had an opinion as to the expense to which the commissioners intended to put the village, and as to what he thought was the proper amount.

One of the water and light commissioners, having testified for defendant that he never understood that a designated person had any connection with the preliminary survey and exploration for the dam except at his own request, and that witness never sent him to Burlington to see an engineer, was properly cross-examined as to whether it was his understanding that this person did go to Burlington, and whether witness was so informed by a third person.

A charge need not single out and make prominent a particular feature of the evidence which is not determinative of any issue in the case.

In an action on a contract for the construction of a dam, providing that the work should be done "according to the plans and drawings," a requested instruction, framed on the theory that the work should be done under the terms and conditions of "the written contract and the plans and specifications thereunder," was properly refused.

In an action on a written contract involving a dispute as to its meaning, which was properly submitted to the jury, a requested instruction that no act of plaintiffs, or of a designated employee of theirs, after the execution of the contract, could be evidence in favor of plaintiffs touching its force, effect, or construction, or as to their understanding of its force, effect, or construction, was properly refused, because how the parties understood the contract and their practical construction thereof were facts material to be considered by the jury.

Where there was a general waiver by the village of a provision in its favor in a written contract for the construction of a dam that extra work should be covered by a written order, and work that was ordered and done was in fact not within the contract, the contractors were entitled to pay therefor, though the agents of

the village believed, at the time the work was being done, that it was within the requirements of the contract, and so, a requested instruction that, if while the work was being done, a majority of such agents honestly believed that the contract and the plans and specifications thereunder required the contractors to do that work, there was no waiver of the requirement that extra work should be covered by a written order was properly refused, especially where the court instructed that, if the work was extra, and, if after it was completed, the dam was delivered to the village and by it accepted with actual or imputed knowledge that the work in question was extra work, or that it had been done without any written order therefor, the contractors might recover.

In an action on a written contract for the construction of a dam, to recover for alleged extra work, a request for an instruction on the hypothesis of plaintiffs' reliance on the conduct and silence of defendant's inspector as constituting a waiver of a requirement that extra work should be covered by a written order was properly refused, where plaintiffs did not rely solely on such conduct and silence to work such waiver.

In such action, requested instructions, including the element of a misunderstanding of the requirements of the written contract and the plans and specifications thereunder by plaintiffs, were properly refused, where there was no claim by plaintiffs that there was any misunderstanding, but there was a disagreement as to the proper interpretation of the contract in certain respects in which it was ambiguous.

It is not error to refuse requested instructions, embodying general propositions of law not involved in the case on trial, however correct in form and substance.

In an action on a contract for the construction of a dam, requiring that the work should be built "to lines and levels and in the manner called for in the plans and specifications," where there was a dispute as to whether it was understood and intended that a line shown in the plans as the profile of the river bottom was to be the bottom line of the construction, or whether it was understood that the contractor was to go to solid rock wherever found, instruction *held* to have submitted this question to the jury in a manner fully protecting the rights of both parties.

In an action on a contract for the construction of a dam, the instruction that, in order to find that defendant had accepted the work

as fully performed, it must appear that defendant had taken the possession and use of the dam with the intention of relinquishing all claim upon plaintiffs for failure fully to perform, told the jury all and more than defendant claimed in the exception to the charge in that connection, for failure to instruct that the mere use and beneficial enjoyment of the dam by defendant could not of itself constitute an acceptance.

ASSUMPSIT for labor done and materials furnished in the construction of a concrete dam with its appurtenant steel penstock. Plea, the general issue with notice. Trial by jury at the June Term, 1911, Lamoille County, *Miles,* J., presiding. Verdict and judgment for the plaintiffs. Defendant excepted. The opinion fully states the case. The diagrams referred to in the opinion are shown on the following page.

*J. W. Redmond* and *F. G. Fleetwood* for the defendant.

Plaintiffs were obligated by the written contract of July 2, 1906, and the specifications and plans thereunder, to furnish and do all that they did in excavating and filling the "pocket," and there is neither latent nor patent ambiguity in the contract. *Crosby* v. *Vermont Accident Ins. Co.,* 84 Vt. 515; *Ladd* v. *Ladd,* 8 How. 10, 12 L. ed. 967; *Hydeville Co.* v. *Eagle Railroad & Slate Co.,* 44 Vt. 395; *Spencer* v. *Potter's Est.,* 85 Vt. 1; *Holland* v. *Long,* 57 Ga. 36; *Paine* v. *Rignold,* 43 Mich. 341; *Morrell* v. *Firth,* 3 Mee. & W. 402; *Watson* v. *Rowe,* 16 Vt. 525; *Pingry* v. *Watkins,* 17 Vt. 386; *Noyes* v. *Canfield,* 27 Vt. 85; *Peugh* v. *Davis,* 96 U. S. 332; 1 Elliott Ev. §598; *Creamery Package Mfg. Co.* v. *Russell,* 84 Vt. 82; *Roberts* v. *Button,* 14 Vt. 203; *Trustees of Public Schools* v. *Bennett,* 3 Dutcher 513, 72 Am. Dec. 373; *Stees* v. *Leonard,* 20 Minn. 494; *Dermott* v. *Jones,* 2 Wall. 1. 17 L. ed. 762; *Paradine* v. *Jane,* Aleyn 26; *Stuart* v. *City of Cambridge,* 125 Mass. 102; *Ashley* v. *Hanahan,* 56 Ohio St. 559, 47 N. E. 573; *Conners* v. *United States,* 130 Fed. 609; *Harrison Granite Co.* v. *Stephens,* 160 Mich. 51, 125 N. W. 36; *Schies* v. *Grand Rapids,* 90 N. W. 700; *Brown* v. *Laurie,* 3 Quebec Q. B. 27; *Keel* v. *East Carolina etc. Co.,* 143 N. C. 429, 55 S. E. 826; *Clark* v. *Pope,* 70 Ill. 133; *Harmony* v. *Bingham,* 12 N. Y. 99, 62 Am. Dec. 142, and note at p. 151; *School Dist.* v. *Dauchy,* 25

FROM EXHIBIT B.

SECTION A.B.
THROUGH PROPOSED DAM AND FOREBAY.

FROM EXHIBIT B.
*(Profile Across River at Dam.)*

PLAINTIFF'S EXHIBIT C.

Conn. 530, 68 Am. Dec. 371; *Rowe* v. *Town of Peabody,* (Mass.) 93 N. E. 604.

Even if the plans do represent the bed of the river along the "Profile Line" to be of a designated quality, that does not amount either to an express or implied warranty or even representation by defendant that such is the quality of the bed of the river along that line, and does not amount to even a representation as to the quality of the river above that line. *Thorn* v. *Mayor and Commonalty of London,* H. L. 1876, 5 Eng. Rul. Cas. 223, 1 App. Cas. 120-128; *Simpson & Co.* v. *United States,* 172 U. S. 372, 43 L. ed. 482; *Groton Bridge & Mfg. Co.* v. *Alabama & Vicksburg Railway Co.,* 80 Miss. 162; *Burgyn* v. *United States,* 34 Court of Claims Reports 348; *Driscoll* v. *United States,* 34 Court of Claims Reports 508.

Even if all that was done and furnished by plaintiffs in excavating and filling the "pocket" was "extras," wholly outside the requirements of the written contract, still plaintiffs cannot recover therefor because such "extras" were not covered by an "order in writing by the owners or their representatives," as required by the written contract. 6 Cyc. 15; 30 Am. & Eng. Ency. of Law (2nd ed.) 1283; *Franklin* v. *Drake,* F. & F. 65; *Baltimore etc. Co.* v. *Coburn,* 7 Md. 202; *Abbott* v. *Gatch,* 13 Md. 314, 71 Am. Dec. 633; *Simpson* v. *New York etc. R. Co.,* 51 N. Y. Super. Ct. 419; *O'Keefe* v. *St. Francis Church,* 59 Conn. 551, 22 Atl. 325; *Vandewerker* v. *Central Vermont R. R.,* 27 Vt. 130, and 27 Vt. 125; *Langley* v. *Rouss,* 185 N. Y. 201.

Neither the silence, conduct, nor knowledge of Slayton and the Water and Light Commissioners, or either of them, which the evidence shows, tends to show any waiver of the requirement of the written contract that extras shall be covered by an order in writing; and that in no event could Slayton waive that requirement. *Baltimore etc. Co.* v. *Jolly Bros. Co.,* (Ohio) 72 N. E. 888; *Woodruff* v. *Roch. & Pitts. R. R. Co.,* 108 N. Y. 39, 14 N. E. 834; *Campbell* v. *Cincinnati So. R. R.,* 9 Ky. Law Rep. 799, 6 S. W. 337; *Sanitary Dist. of Chicago* v. *McMahon etc. Co.,* 110 Ill. App. 510; *Homershaun* v. *Water Works Co.,* 6 Exch. 137; *Thayer* v. *Railroad Company,* 24 Vt. 440; *Herrick* v. *Belknap's Est.,* Ib. 673; 1 Redfield R. R. (5th ed.) 431, 433; *Langley* v. *Rouss,* 185 N. Y. 210, 7 Am. & Eng. Ann. Cas. 210; *Bannon* v. *Jackson,* 121 Tenn. 381; 17 A. & E. Ann. Cas. 77; *Van Buskirk* v. *Board of Education etc.,* (N. J.) 75 Atl. 909; *Russell* v. *Sa*

*Da. Bandeira,* 13 C. B. N. S. 149-200; *Sharpe* v. *San Paulo Ry.*
*L. R.,* 8 Chy. 579; *Rex* v. *Peto,* 1. Y. & J. 37; *Cooper* v. *Lang-*
*don,* 9 M. & W. 60; *Lord & Sons* v. *Pryce,* 4th ed. Emden Bldg.
Contracts, p. 664; *Stuart* v. *Cambridge,* 125 Mass. 102; *Mc-*
*Intosh* v. *Hastings,* 156 Mass. 344, 31 N. E. 288; *Leveronne* v.
*Arancio,* 179 Mass. 439, 61 N. E. 45; *Charlotte etc. R. R.* v. *Bur-*
*well,* 56 Fla. 217, 48 So. 213; *Chicago etc. Co.* v. *Garner,* 132
Ia. 282, 109 N. W. 780; *Selby* v. *Root,* 84 Neb. 723, 121 N. W.
952; *McGratty* v. *Haberman,* 127 App. Div. 199; *Cashman* v.
*City of Boston,* 76 N. E. 671.

Plaintiffs can recover nothing under the written contract,
because they have failed substantially to perform it. *Elliott* v.
*Caldwell,* 43 Minn. 357; *Vail* v. *Hubbard,* 37 Vt. 114; 30 Ency.
of Law 1223; *Morgan* v. *Gamble,* 79 Atl. 410; 6 Cyc. 67, 68, and
cases cited; 30 Am. & Eng. Enc. of Law (2nd ed.) 1281-1282;
*Zottman* v. *San Francisco,* 20 Cal. 97, 81 Am. Dec. 105; *Cincin-*
*nati* v. *Cameron,* 33 Oh. St. 374, and cases cited; *Wilson* v.
*School Dis.,* 32 N. H. 118; *Davis* v. *Hospital Assn.,* 121 Wis.
379, 1 A. & E. Ann. Cas. 950.

*W. B. C. Stickney, Charles H. Darling* and *R. W. Hulburd*
for the plaintiffs.

The case shows such substantial performance by plaintiffs,
in good faith, as entitles them to recovery. *Steamboat Co.* v.
*Wilkins,* 8 Vt. 54; *Ripley* v. *Chipman,* 13 Vt. 268; *Brown* v.
*Kimball,* 12 Vt. 617; *Booth* v. *Tyson,* 15 Vt. 515; *Florida Rail-*
*road Co.* v. *Smith and Latrobe,* 21 Wall. 255, 22 L. ed. 513; *Hay-*
*ward* v. *Leonard,* 17 Pick. 181; *Morse* v. *Potter,* 4 Gray 292;
*Walker* v. *Orange,* 16 Gray 193; *Cardwell* v. *Bridge,* 9 Allen
385; *Powell* v. *Howard,* 109 Mass. 192; *Cullen* v. *Sears,* 112
Mass. 299, 308.

WATSON, J.   The case was tried on the second, third, and
fourth counts of the amended declaration, being two special
counts and the general count in assumpsit.   These counts were
held sufficient (on demurrer) when the case was here before.
84 Vt. 312, 79 Atl. 391.   Plea, general issue, and notice (1) of
payment, and (2) that the excavation and filling of the fissure
mentioned in the declaration, and all the work, and material
therein contained and made, were in fulfillment of the written

contract between the plaintiffs and the defendant, dated July 2, 1906, and the plans and specifications therein referred to; that the plaintiffs have failed to fulfill said written contract, and recoupment. A trial by jury was had, resulting in a verdict for the plaintiffs; judgment was rendered on verdict; and the case is here on defendant's exceptions.

For the purpose of showing the evidence, the tendency thereof, the objections and motions made during the trial, the grounds upon which the same were based, the rulings thereon and the exceptions taken thereto, a duly certified transcript of the whole case is referred to and made a part of the exceptions and is to control. The exhibits and the charge of the court are also referred to, made a part of the exceptions, and are to control.

It appeared that on July 2, 1906, the village of Morrisville, by its water and light commissioners, entered into a written contract with the plaintiffs, Douglass & Varnum, containing provisions material to be noticed, as follows:

"The said Douglass & Varnum agree to construct a concrete masonry dam and steel penstock and to furnish all labor and material and perform all work called for in specifications hereto attached and in plans used in connection therewith, for the improvement of the electric light and power plant for the village of Morrisville at Cadys Falls, in the town of Morristown, Vermont, for the price of fifty thousand, seven hundred and twenty-seven dollars and eighty cents ($50,727.80).

"Said work shall be undertaken and performed under all the terms and conditions of the specifications hereto attached, with the following exceptions:.

"The work shall be performed according to the plans and drawings prepared by H. M. McIntosh, which plans and drawings are made a part of this contract, except that such part of the dam as is west of the spillway shall be built to an elevation of 106.35 instead of 108.35 as shown on said plans.

* * * * * * *

"If any change is made in the plans and specifications by the village of Morrisville whereby the construction, work or materials is (are) less than that specified in the specifications, Douglass & Varnum shall allow the said village therefor, and the amount of such allowance shall be based upon the bid for

such work filed with the water and light commissioners of Morrisville by Douglass & Varnum.

"The presence of the inspector, or the approval of any work covered by the specifications hereto attached by such inspector, shall not relieve Douglass & Varnum from liability for faulty construction or for any work improperly or negligently performed."

Of the provisions contained in the specifications, particular notice need be had only to the following:

"The work called for under these specifications consists of all earth and rock excavation, backfill and grading, concrete masonry, iron work, steel work, wood work, and all other work that may be required for the entire completion of the dam, forebay, wing walls and retaining walls and penstock, piers, flood and waste gates, gate hoists, rack, penstock, vent stack and of connecting the new penstock with the present penstock near the power house.   All work to be performed in accordance with these specifications and with plans furnished and to be furnished by the water and light commissioners of the village of Morrisville, Vt., and in accordance with the directions of and to the entire satisfaction and acceptance of the said water and light commissioners or their representatives.

"In these specifications, the term owner refers to the village of Morrisville by its authorized representatives, the water and light commissioners.   The term contractor refers to the contractor for the work called for under the specifications, and the term inspector refers to the inspector in charge of the work, appointed by the water and light commissioners of Morrisville, Vermont.

\* \* \* \* \* \*

"Contractors submitting bids or tenders on this work are expected to compare plans and specifications with the site and no demands or allowances shall be made on account of any misunderstanding of the plans and specifications.

"No estimates of quantities will be furnished by the owners, but the contractor must examine the plans and specifications, comparing them with the site, and the lump sum bid must cover the total expense of securing a proper foundation and building the work specified to lines and levels and in the manner called for in the plans and specifications.

\* \* \* \* \* \*

"The contractor shall keep employed at all times on the work a competent English speaking foreman, foremen, and any directions given by the owner, or inspector, to any foreman who appears to be in charge of the work, shall be valid and binding upon the contractor the same as if given to him in person.

\* \* \* \* \*

"The contractor shall give all necessary assistance at all times for the proper inspection of the work by the owner or inspector.

\* \* \* \* \*

"So long as the work herein contracted for is prosecuted agreeably to the provisions of the contract and with such progress as may be satisfactory to the owners, the owners by their representatives will, on or about the first day of each month, make an approximate estimate of the proportionate value of the work done thereon and of the material furnished, delivered to and accepted by the owners on their property at the site of the works and the amount of said estimate less 15% and all previous payments, shall be due and payable to the contractor at the office of the water and light commissioners on or before the 12th day of the current month.

"Upon the completion of the work to the satisfaction and acceptance of the owners, a final estimate of the total amount of contract and all extra work performed by the contractor by order of the owners shall be made, and this total sum, less all previous payments, shall be paid to the contractor within thirty days of date of said final estimate.

"Excavation will include all grubbing, clearing, earth and rock excavation necessary for a proper foundation for the penstock to be placed to grade and lines shown on plans, the removal of all earth and rock and a sufficient amount to secure two trenches in solid rock as shown on drawing for foundation for the dam, and to secure a foundation for flume and flood gates and clear approaches to same to a level as shown on plans.

"The rock at the east end of the dam shall be removed to a point to secure a shoulder of at least two feet in solid rock.

"Excavated material not used in the construction of the dam shall be placed around and over the penstock, thoroughly tamped and puddled to be placed there after the tube is tested under full head of water.

\* \* \* \* \* \*

"Any work which may be found necessary to perform that is not covered by this specification and the contract, must be covered by an order in writing by the owners or their representatives and will be paid for at actual cost, plus 10%.

"No allowance or payment will be made for any work performed, or material furnished, not covered by the contract or such order."

The water and light commissioners mentioned in the contract (including the specifications) are hereinafter designated as commissioners, and generally the village of Morrisville, as the village.

The written contract was introduced in evidence and marked plaintiffs' Exhibit A, and the same is hereinafter referred to as exhibit A. Blue print copies of the plans and drawings prepared by H. M. McIntosh and referred to in the contract and made a part thereof, were introduced in evidence and marked plaintiffs' exhibit B, and the same is hereinafter referred to as exhibit B. This exhibit comprises four pages, or sheets, of plans and drawings bound together, and are the plans and drawings received by the contractors.

It appeared that said McIntosh was defendant's consulting engineer during all the time material here, and is the "engineer" referred to in exhibit A; that he secured the data for and made exhibit B; that Calvin A. Slayton was the "inspector" referred to in exhibit A, as "the inspector in charge of the work, appointed by the water and light commissioners of Morrisville,"— It further appeared that Slayton held no office under the village, and had no authority from it or from the commissioners, except what was conferred upon him by the provisions of exhibit A, or otherwise by the commission within the tendency of the evidence.

Exhibit B, on fourth page, at upper right-hand corner, contains a diagram headed "Profile Across River at Dam." The diagram is marked by an irregular semi-elliptical line, the west end of which is at the elevation (from an assumed bench mark) of the top of the proposed dam, and on this line going easterly are figures showing the elevation at different places, that is, 100.35, 98.3, etc., down to 81.6, thence continuing, 79.1, 76.0, 75.3, 74.7, 75.1, 76.2, 77.1. With one exception, the elevations were taken at intervals of twenty-five feet until the water line was reached, with one or two plus measurements, and after

getting to the ice on the river the intervals were shortened to twenty feet. This line is known in this case as the "Profile Line," and its two ends represent respectively the points of the east and the west end of the dam-construction. At elevation 100.35 is a horizontal line drawn to represent the "Crest of Spillway" of dam, and at elevation 81.6 is a horizontal line showing the level of "Top of Ice March 9, 1906," relative to the other features indicated on the plan. Immediately west of the west end of the spillway are parallel dotted perpendicular lines drawn from the line showing the top of the dam to elevation 77.1, passing over the full profile line, indicating in a general way the approximate position of the waste tubes, head gates, etc. This diagram is drawn to the scale of four feet to the inch from right to left, and forty feet to the inch up and down. The exceptions state that "There was no evidence in the case tending to show that the diagram in the upper righthand corner of" the fourth page of exhibit B, "nor any part of that exhibit," nor exhibit A, "specifically designated the amount of excavation required to the *left* of the dotted line at the end of the word "Dam," in the legend, "Profile across River at Dam," on said fourth page, and the whole of the spillway is to the *left* of that line." The second page of exhibit B shows sections through the proposed dam and forebay. Section AB represents a cross-section of the spillway-section of the dam, as indicated by the line A-B shown on the first page of that exhibit, which line is thirteen feet east of the west end of the spillway, also of the bulkhead. The top of section AB represents the crest of the spillway. The perpendicular side of this section is in the up-stream face of the dam. The curved side is in the down-stream face of the dam. The lower end of the curve has been and is called in this case "the foot of the toe." The height of this section above the foot of the toe, is definitely specified thereon as twenty feet and ten inches. The crosshatching at the bottom of the section indicates solid rock, and the two (practically) right-angled depressions, one at the right-hand side and one further toward the left, indicate trenches made in the rock lengthwise of the dam, to be backfilled with concrete. The legend on the oblique line extending downward from the foot of the toe, "Batter 1 in 1½," only indicates the required slope of that face of the masonry below that point. But the plans contain nothing showing the height of the level of the foot of the toe

above the bed rock represented by the crosshatching—on the face of the plans, that is left indefinite.

It appeared, says the bill of exceptions, that the regular manner by which engineers and draftsmen indicate on a diagram rock formation is by what is known as "crosshatching," such as appears at the base of the diagram section AB, and at the base of the other diagrams on the second page of exhibit B; that the dam in question was in fact constructed in such a manner that the up-stream and perpendicular surface is tangent to, and flush with, the profile line, that is, the whole structure is south of this line; that this was done in compliance with the requirements of exhibits A and B, as both parties understood and construed them; that it appeared from the plan and testimony of witnesses that the figures on section AB above the foot of the toe show perpendicular distances, and that therefrom it appears that the perpendicular distance from the crest of section AB to a line drawn through the foot of the toe, at right angles to the perpendicular side of the section, is 20 feet and 10 inches; that, in accordance with the parties' mutual understanding of the requirements of the contract and the plans and specifications thereunder, the whole spillway of the dam was constructed as if section AB, above the foot of the toe, was a typical section of the whole spillway, that is, the whole spillway was constructed as to curve, shape, and dimensions, as required by section AB above the foot of the toe, and throughout the spillway the perpendicular distance from its crest to a horizontal line drawn through the foot of the toe, is 20 feet and 10 inches; that when section AB is placed against the profile line at the point where it purports to be a section of the spillway, the perpendicular distance from the crest of section AB to the point where it touches the profile line is 14 feet and 4 inches; that the perpendicular distance from the last mentioned point to a line drawn through the foot of the toe, at right angles to the perpendicular side of section AB, is 6 feet and 6 inches in solid rock, and that still deeper excavation had to be made, and was made, in solid rock, for the foot of the toe through between section AB and the west end of the spillway, at which last named point the foot of the toe is 10½ feet below the profile line; that the foot of the toe does not coincide with the profile line until at a point 42 feet east of the west end of the spillway; that the perpendicular distance from the foot of the toe to the line marking the top of

the trenches as shown in section AB, is 6 feet and 2 inches; that the full perpendicular height of section AB, from its crest to the indicated rock, is 27 feet and 1 inch; that the lowest point on the profile line is the elevation 74.4, marked thereon; that the crest of the spillway, as shown on the diagram in the upper right-hand corner of the fourth page of exhibit B, has the elevation of 100.35, consequently the lowest point of the profile line is 25.95 feet below the crest of the spillway; and so section AB at no place coincides with the profile line, and if it be placed on this line at its lowest point, it would extend 1.13 feet below the line.

The bill of exceptions further states that it appeared that the surface of the river bottom at the site of the proposed dam, and for a considerable distance north and south, appeared to one making an inspection by merely gazing at it, to be ledge, and that the banks of the river at said site, for a considerable distance north and south, the east bank, and the country for some distance west of the west bank, showed ledge formation that frequently came to the surface; that neither party, before executing the contract evidenced by said exhibits ever made any borings or other endeavor to ascertain the quality of the river bottom or any part of the site of the proposed dam, or to compare that site with exhibits A and B, except to stand on the bank of the river in that vicinity and discover what could be seen there by mere inspection, and except that, before the execution of the contract, George Badger informed plaintiffs of the soundings made through the ice March 9, 1906, and surface levels taken, as hereinafter stated, and that those were indicated on the profile line; that plaintiffs began the work of constructing the dam shortly before July 2, 1906, and during the progress of that work, which was begun from the west side, it was discovered that the ledge apparently forming the river bottom dipped at a point a little west of the center of the stream, forming the large fissure or pocket here in question; that this pocket was full of a substance unsuitable for the foundation of a dam, which required excavation and filling with concrete masonry in order to construct a suitable dam for the purpose required by the defendant, whereupon plaintiffs excavated the pocket and filled it with such masonry, for which they charged defendant $17,118.05; that for ten days or two weeks previous to December 1, 1907, defendant's existing electric light and power plant was shut down,

at plaintiffs' request, for the purpose of allowing the latter to connect the new penstock with the old one; that at the end of the ten days or two weeks mentioned, plaintiffs made the connection of the old penstock with the new one, and thereupon, for the purpose of testing the penstock, let water .into it from the new dam; that ever since which time defendant has used the water and penstock of its said plant, having no other power, and it has never been requested to shut down its said plant, so as to allow plaintiffs to complete their contract, nor for any other purpose.

It also appeared from plaintiffs' evidence as to the facts above recited that when the dam was finished, or considered by them to be finished, the plaintiffs' foreman and the inspector, Mr. Slayton, and all the members of the commission, except Judge Powers, went to the headgates and the water was let into the penstock, and immediately afterwards the machinery of defendant's plant was connected and ever thereafter continued in operation; that lines of wire have been connected with the power house and the same have been used by defendant for municipal lighting, etc., and for commercial purposes, without cessation.

The plaintiffs claimed in the court below that the work of excavating and filling the pocket was wholly outside the original contract, and was not contemplated or expected by either party at the time of the execution of the contract, and was, therefore, extra work; that by the terms of the contract they were required to construct the foundation of the dam substantially on the bed of the river, with such excavation as was required by the various plans and drawings, and that both parties understood that the bed of the river at the point where the dam was to be constructed was substantially solid rock and suitable for a foundation for the dam, and that the only work required to be done in order to prepare it for the superstructure, was to remove some minor loose matter resting upon the surface of the rock and to make the required excavations shown in the plans and drawings, and that the real condition of the rock could not have been discovered without an actual investigation as made in the excavation itself. The defendant claimed throughout the trial that the contract in question, by its terms and as construed by the acts of the parties, required the plaintiffs to excavate and fill the pocket as they in fact did, and denied that it made the contract with the understanding that the dam was to be constructed substantially

on the bed of the river as claimed by the plaintiffs, but on the contrary it understood that the dam was to be built upon solid rock wherever that was found; and upon these issues much evidence was submitted.

Plaintiffs' Exhibit C (hereinafter referred to as exhibit C) is a plan, having a scale of five feet to the inch both horizontally and vertically, so that the vertical distances and the distance across the stream are both natural, the former not being exaggerated as they are on the fourth page of exhibit B. The profile line on exhibit B is represented on exhibit C by the red line marked thereon as "McIntosh Profile Line," the top of the ice March 9, 1906, is represented by a purple line marked, "81.2 Top of Ice March 9, 1906," and the elevations are given as on exhibit B, but the position is reversed, that is, on the latter one is looking up the stream, while on exhibit C one is looking down the stream. The crest of the dam, and the crest of the spillway are also marked on the latter exhibit. The shaded part of this plan at the bottom, underneath the crest of the spillway, represents the amount of excavation, and of filling with concrete, below the profile line shown on exhibit B.

Defendant's counsel in their brief divide the exceptions upon which they rely into groups. They discuss the case under ten different heads, numbered numerically. Under I, they call attention to the issues involved. Under II, they notice at length the opinion of this Court in the case when it was here before. III. Motion for a directed verdict.

At the close of the evidence, defendant moved for a directed verdict, and in its brief the important grounds are stated as follows:

1. Because by the terms of the written contract, and the specifications and plans thereunder, plaintiffs were obligated to excavate and fill the pocket just as they did.

2. Even if the excavating and filling the pocket were extras, outside the requirements of the written contract, still plaintiffs can not recover therefor, because they were not "covered by an order in writing by the owners or their representatives," as required by the terms of that contract.

3. There is no evidence in the case tending to show any contract, express or implied, to pay the plaintiffs for excavating or filling the pocket.

27

4. On all the evidence in the case, viewed in the light most favorable to the plaintiffs, they have not substantially performed the requirements of the written contract; for the plaintiffs, as the uncontradicted evidence shows, have failed to comply with the following requirements thereof: (the requirements stated will be noticed later in connection with our discussion of this ground).

The motion was overruled, to which defendant excepted.

In this connection it should be borne in mind that by the specifications, the work called for thereunder "consists of all earth and rock excavation.— * * concrete masonry, * * * * and all other work that may be required for the entire completion of the dam, * * * All work to be performed in accordance with these specifications and with the plans furnished and to be furnished by the" commissioners. "Excavations will include the removal of all earth and rock and a sufficient amount to secure two trenches in solid rock as shown on drawing for foundation for the dam, * * *" "and the lump sum bid must cover the total expense of securing a proper foundation and building the work specified to lines and levels and in the manner called for in the plans and specifications."

While the specifications and the plans and drawings are, in a legal sense, part of the written contract, yet in the discussion of the case it sometimes becomes necessary to refer to them, as well as to the contract, separately. In this instance we call attention to the provision in the contract that "Said work shall be undertaken and performed under all the terms and conditions of the specifications hereto attached, with the following exceptions: 1. The work shall be performed according to the plans and drawings prepared by H. M. McIntosh, which plans and drawings are made a part of this contract," etc. By this provision of the contract, the performance of the work must conform exclusively to the "plans and drawings" mentioned. And such was the plaintiffs' obligation in that respect.

It appeared that on March 9, 1906, engineer McIntosh, Mr. Slayton, George Badger and his son Fred Badger, were down on the ice of the river at the place represented on the fourth page of exhibit B, as "Top of ice March 9, 1906"; that soundings were then made there by McIntosh, by putting down through holes made in the ice, a pole having a steel or iron tip, to ascertain the character of the bottom of the river, and each time when

he put the sounding-rod down, he made notes in a note book of what he found; that McIntosh and Slayton were there under the employment of the defendant, but George Badger and his son were mere volunteers, representing no one, though all took part in the soundings made; that from the soundings then made, George Badger supposed the stream had rock bottom at every place where the soundings were made, all the way across. The notations made in the book by McIntosh, were, that at elevation 79.1, the bottom was rock or boulder; at elevation 76.0, the bottom was rock or boulder; at elevation 75.3, the bottom was gravel; at elevation 74.7, the bottom was rock or boulder; at elevation 75.1, the bottom was gravel; at elevation 76.2, the bottom was gravel; and at elevation 77.1, (the place of the last sounding,) the bottom was gravel. The defendant's evidence showed that the profile on the fourth page of exhibit B, was made by McIntosh from the soundings and measurements taken that day. The testimony of Slayton, as to the character of the river bottom, shown by the soundings, agreed with the notations made in the note book. It appears that before the plaintiffs executed the written contract, they were told by George Badger, then and ever since in their employ, of the aforementioned soundings, and given an account of what was found. It further appeared that after the plans and specifications were prepared, and before plaintiffs had made their bid, plaintiff Varnum met all the commissioners (except perhaps Judge Powers) at the office of commissioner Stafford in Morrisville, and by them was there shown the plans, exhibit B, and also the notes made by McIntosh at the time of making the soundings as above stated. Slayton, George Badger, and defendant's attorney Fleetwood, were present. Plaintiff Douglass was at the meeting, but not at first—came on a later train.

In direct examination, Varnum testified to the plaintiffs' bid being made through Badger. He then testified as follows: Q. Now before making that bid won't you tell us what you had done towards ascertaining the character of the work which you were required to do, in reference to the specifications, the plans, and any examination that you may have had made of the premises? A. I came from Cambridge to Morrisville on the morning train. I think that I went to Mr. Fleetwood's office, at least he had an office on the same floor—where I saw the plans and notes in regard to the dam; and that Mr. Badger and I then,

after looking at the plans, came down to the site and spent perhaps two hours. Q. And at that time did you see any plans similar to this plan B? A. I did—as I remember them I should say that was the same plan. Q. Now you were going on to say when I interrupted you that you and Mr. Badger went from this place of the meeting, down to the site; won't you state what you did then? A. Mr. Badger showed me where the surveys had been made. There were lines up, stakes, I think, on the line of the dam, in as far as it was on the west side of the river; and I think there was one stake on the east side of the river, showing where the east end was—or some mark—I can't say that it was a stake. There was also a stake line where the pipe line was to be laid to connect with the old pipe in the other plant; and there may have been others, but I remember so many. Q. What do you say as to whether that line so indicated to you, corresponded or did not correspond with what information you had at the office? A. I supposed it did. Q. That was your judgment? A. There was no evidence of any other survey there; as I understood surveys that was the line. Q. And in what you did afterwards whether or not you acted upon the assumption that that line was the line of the survey, of the plan? A. Yes. The only comment I would make is, that when the actual work begun it was optional with Mr. McIntosh that the line may have been moved a few inches, or may not; but I never knew that they were.

Plaintiffs' evidence tended to show that at the above mentioned interview with the commissioners, the condition of the ground and material of the surface for the dam site was spoken of and Varnum was told that it was rock foundation, first class site for a dam. Varnum testified in cross-examination concerning what the commissioners said to him on that occasion, as follows: Q. Wait. Just answer by yes or no, as to the condition of the soil, what it was, did anybody represent anything to you on that occasion? A. They all did. Q. And you didn't understand me, if you said to the contrary when I was examining you before on that matter, did you? A. The lines and the profiles were not spoken of possibly; but the condition of the ground and the material of the surface was spoken of. Q. Was anything said by anybody on that occasion as to the condition of the surface of the soil along that profile line? A. I just answered that. Q. You say there was? was or wasn't? A. There was.

Q. Now can you tell us who said it? A. I think all of them.
Q. All that were there said it? A. The conversation was general
and all took part in regard to the conditions at this dam site.
Q. Now what did anyone say was the condition of the surface
of the soil along that profile line? A. That there was rock at
the east end clear to the height of the spillway; that there was
rock at the west end outside of the water; that the soundings
were taken on the ice and were all rock; that beyond the high-
water mark was where the rock disappeared; that the ledge
cropped out all the way up to the proposed height of the retain-
ing wall that goes out to the west end—that was the import of
the whole conversation and interview and coincided with what I
saw when I went down there to look at it. There was rock
visible on both sides of the river and as far into the water as I
could see on the east side—the water was deep—couldn't see
more than a few feet. On the west shore the water was shallow
and I could see from fifteen to twenty-five feet, perhaps, of bed
rock. Up the river it was bare rock, and down the river it was
bare rock. Q. Now didn't they say that the appearances were
down there that there was rock on each side, and as far as you
could see in the water it looked as if it was ledge there, too? A.
They said it was rock; a first-class site for a dam; it was rock
foundation. Q. You had in mind this provision of the contract,
didn't you, that contractors submitting bids are expected to
compare the plans and specifications with the site, and that no
allowance was to be made on account of any misunderstanding
of the plans and specifications, you had that in mind? A. Cer-
tainly. Q. And was that a warning to you that you shouldn't
take anybody's advice about that site, as you understood it?
A. Certainly. Q. Now, Mr. Varnum, except to go down there
and stand on the bank and look over, before this contract was
made, did you ever make any comparison or investigation of
any kind? A. I didn't make any measurements. Q. Or com-
parison, except to stand there and look? A. I took the plans,
you see, to know what the idea was. Q. Yes. A. I took the
plans and went down to the site with Mr. Badger—I think he
was the only person with me, I can't remember any other—he
showed me the line of stakes which he said represented the loca-
tion of the dam; and I examined the shores by walking over
them and looking them over; they showed just what had been
represented at the office, that the east shore was ledge going

vertically almost into the water; that the west shore was bare ledge with loose rocks scattered over it from the crest line, or high water mark, as I interpreted it, down to the water on the west shore; and the west shore was shallow out for some distance, I can't recall exactly, but I would say from fifteen to twenty-five feet that the water wasn't over two feet in which the same condition of rock was visible as it was on the part where I was standing—there was loose rock on it. The rest of the ground toward the west end was covered as I have testified, I think, with bushes and rock cropping out. I didn't go out over the river in a boat—couldn't at that time.

Plaintiff Douglass testified to looking over the site of the dam with Badger before executing the contract, in fact before he saw the plans; that he then saw holes through the ice, and Badger, who was then in his employ, told him what they were and about the soundings which had been there made; that he went down there to examine the site, having in mind the possibility of executing a contract with the village of Morrisville, though he had not then entered into any arrangement with Mr. Varnum concerning it; that from his observations made and the information then obtained, he satisfied himself as to the character of the bottom of the stream, and later in making the bid of the plaintiffs he took into consideration what he had observed on the aforementioned occasion, and the fact that the bottom of the stream was rock.

The plaintiffs' evidence further tended to show that the so-called pocket was full of a substance unsuitable for the foundation of a dam, which required excavating and filling with concrete masonry in order to construct a dam suitable for defendant's purpose; that this condition could not have been discovered beforehand without experimenting at a great and disproportionate expense, and was not discovered by the plaintiffs until after they had executed the contract and begun work on the dam, in the progress of which they discovered it, and that it was discovered by the defendant at the same time; that it would be almost impossible, without having seen the actual conditions, to make any sort of an estimate of what it was worth to do this work of excavating and filling the pocket, what would be a fair price for it. Defendant's evidence tended to show that the existence of such a pocket at the place where it was found, could have been discovered beforehand, by the use of an earth-

auger, or an earth-boring machine, sometimes used for similar purposes, at an estimated expense of one hundred fifty dollars.

Plaintiffs claimed and their evidence tended to show that the section of the profile line below the legend, "Top of ice, March 9, 1906," represented the bed of the river to be solid rock, and that throughout that section at least exhibits A and B required the foundation of the spillway to be placed at the levels or elevations shown on that section of the profile line, which, it appeared, were the levels or elevations of the surface of the river bottom at those points; that the word "levels" as an engineering term has technical significance and means elevations, and that the elevations on the plan, exhibit B, fourth page, were marked by figures, 100.35 being the elevation of the crest of the spillway, and 79.1, 76.0, 75.3, 74.7, 75.1, 76.2, and 77.1, being the several levels marked on the profile line below the legend mentioned.

Defendant claimed and its evidence tended to show, that section AB both purports to be and is an actual section of the required spillway at the point indicated by the line A-B on first page of exhibit B; that section AB represents that, at the point where it purports to be a cross section, bed rock suitable for the foundation of a dam would be found at the distance from the crest of the spillway where rock is indicated on that section, namely, 27 feet and 1 inch; that the fact that the exact perpendicular distances above the foot of the toe are designated on section AB and no such distances are designated below the foot of the toe, indicates that the spillway was required throughout its whole length to be constructed above the foot of the toe of the form and dimensions indicated on section AB, but that the absence of the designated altitudes below the foot of the toe, indicates that plaintiffs were required to go to bed rock for the foundation of the dam,—the absence of designated altitudes below the foot of the toe indicating that this bed rock may be found at varying distances; that during all the time the dam was being constructed and the pocket being excavated and filled, defendant understood, and its inspector and all the commissioners understood, that plaintiffs were excavating and filling the pocket because they were required to do so by the terms of the contract evidenced by exhibits A and B. While plaintiffs' evidence tended to show that section AB was a typical section, and that the plan indicated and was construed by both

parties as meaning that the profile line in the river bottom was bed rock, requiring practically no excavation below; that the discovery of the pocket was a surprise to the commissioners, and some of them so stated; that while the work was in progress the commissioners required the dam to be built a foot thicker across the stream for the reason that it was so much deeper than was represented on the plans and than they expected, and that was the judgment of the engineer, Mr. McIntosh, this reason being assigned by them for requiring the extra thickness; and furthermore, that when the excavation was almost completed, being only about two yards to be excavated, plaintiff Varnum requested leave of the inspector to bury the two yards and fill with concrete, to which the inspector replied, ''Keep digging as long as you can. As soon as you get the concrete mixed, we will let you cover it up.'' Defendant's evidence further tended to show that it never had made any representations to plaintiffs, or either of them, or anyone representing them, as to the quality of the river bottom, or how far they would be required to excavate to fill said contract, except such representations as are contained in exhibits A and B.

No ambiguity appears on the face of the contract, but a latent ambiguity was raised by extrinsic evidence in the provision contained in the specifications that ''the lump sum bid must cover the total expense of securing a proper foundation and building the work specified to lines and levels and in the manner called for in the plans and specifications.'' The ambiguity consists in the equivocal or uncertain meaning of the phrase, ''to lines and levels and in the manner called for in the plans and specifications.'' What lines and levels in the plans. The plaintiffs claimed and their evidence strongly tended to show that the lines and levels to which reference was thus made, were the lines and levels both at the top and at the bottom of the drawing (marked ''Profile across River at Dam'') on exhibit B, fourth page, at upper right-hand corner. The defendant claimed and its evidence strongly tended to show that the lines and levels thus referred to were only those at the top of the drawing mentioned. The phrase in question is capable of being understood in either of these two senses. Parol evidence was introduced by plaintiffs tending to show the circumstances under which the contract was executed, that the conversations and acts of the parties to the contract, at and about

the time of making it, and the contemporaneous, and the subsequent practical, construction given it by them, were in accordance with the contention of the plaintiffs. The tendency of defendant's evidence was to the contrary. The evidence standing thus, with the burden upon the plaintiffs, it was for the jury to say whether the parties understood the contract in this respect as claimed by the plaintiffs. *Andrews* v. *Moretown*, 45 Vt. 1. This Court said in the case of *Vermont and Canada R. R. Co.* v. *Vermont Central R. R. Co.*, 34 Vt. 1, 64, "Where the language of a contract is not explicit and incapable of but a single meaning and application in reference to the subject-matter of it, what was the particular meaning and application which the parties mutually intended is open to inquiry upon evidence pertinent thereto. And acts of the parties themselves, in carrying out the stipulations of the contract, and, particularly, the acts of a party in assuming the burdens imposed upon him, to the most onerous extent of which the language of the contract is capable, are evidence of the most convincing character as to what their meaning was by the language used. When their meaning in this respect is determined upon evidence, in aid of the written instrument, that instrument, with that meaning, is the contract between them, and is effective to the same intents between them, * * * as if that meaning had been expressed in unequivocal words in the instrument itself; * * * *"

The second and the third grounds upon which the motion for a verdict was based, are so related to each other as to make it more convenient to consider and dispose of them together. In short they are that, even though the excavating and filling the pocket were extras, outside the written contract, still the plaintiffs cannot recover therefor, because not "covered by an order in writing by the owners or their representatives," as required by the written contract, and there was no evidence of an express or implied contract to pay for such work.

All the evidence in the case tending to show that at the time of the execution of the contract and afterwards as the work progressed, the commissioners understood that by the terms of the contract the foundation of the dam was to be constructed substantially on the bed of the river shown by the lines and levels on exhibit B, fourth page, as claimed by the plaintiffs, also had a bearing on the question of whether the commissioners waived the provision of the specifications requiring

that extra work found necessary to perform, must be covered by an order *in writing* by the owners or their representatives, to entitle the contractors to an allowance or payment for such work performed, or material furnished. If the commissioners understood that the foundation of the dam was, by the terms of the contract, to be constructed substantially on the bed of the river, as claimed by the plaintiffs, then they must have known that the work of excavating the pocket and filling the same, a work of such magnitude and expense, found necessary to perform, was not covered by the specifications and the contract, and they must have further known that this work was not covered by any order *in writing* by the owners or their representatives, but was covered by a verbal order given by the inspector under their direction or acquiescence. The evidence further tended to show that having such knowledge, the commissioners during this work of excavating and filling the pocket, made no objection thereto, and subsequently accepted the benefits thereof. In discussing the sufficiency of the pleadings when this case was here before, (84 Vt. 302, 79 Atl. 391,) we said, "and when, by its inspector, it (defendant) stood by day after day and saw the work go on without objection, and was content to let it continue until finally completed, knowing that no such order (in writing) had been given, and also knowing, as it must have known, that the plaintiffs were expecting extra compensation therefor, and then receiving and accepting the completed structure without objection, and ever since using the same as its own, it must be taken to have waived its right in respect of such an order."

The plaintiffs' evidence tended to show nearly a dozen instances, other than that of excavating and filling the pocket, when they performed work and furnished materials not covered by the specifications and the contract, under verbal directions by the inspector, concerning which no claim was made that they were not so directed, nor that they were not extras, and that sometimes when such directions were given, some of the commissioners were present and heard them given, and sometimes they were not; that the extra work done and materials furnished in more or less of these instances were estimated by the engineer, as extras, during the progess of the work under the written contract, and as to four of the instances, the amounts charged were conceded to be correct, the only defence being that they

were not covered by an order in writing. Yet the record shows no instance of extras being covered by such an order.

A waiver may be inferred from an order to perform extra work under such circumstances as imported a promise to pay therefor. *Bartlett* v. *Stanchfield,* 148 Mass. 394, 19 N. E. 549, 2 L. R. A. 625. It has been held that where the owner requested the contractor, without writing, to furnish a large number of items of work and materials, and the same were furnished by the contractor and accepted by the owner, and part of them were paid for, a provision in the contract that the contractor would make no charge for extra work unless ordered in writing by the owner or its engineer was waived. *Kilby Mfg. Co.* v. *Hinchman-Renton Fire Proofing Co.,* 66 C. C. A. 67, 132 Fed. 957; *McGrath Constr. Co.* v. *Waupaca-Green Bay R. Co.,* 148 Wis. 372, 134 N. W. 824; *Schmulbach* v. *Caldwell,* 115 C. C. A. 650, 196 Fed. 16; *O'Keefe* v. *St. Francis' Church,* 59 Conn. 551, 22 Atl. 325. In *Davis* v. *LaCrosse Hospital Ass'n.,* 121 Wis. 579, 99 N. W. 351, 1 Am. & Eng. Ann. Cas. 950, it was said, "If, under a contract containing such a provision, a builder were requested to and did perform extra work of such magnitude that the idea that it was intended he should have no additional pay therefor would appear highly unreasonable or absurd, a court might, nothing appearing to the contrary, conclude that there was a mutual intention to waive such provision." The fact that throughout the performance of the work called for by the written contract, the commissioners entirely disregarded the stipulation therein as to the *form* of the orders for extra work or materials, the order given in every instance being verbal, taken with the other evidence bearing upon the question, was sufficient to justify a finding of a general waiver, an intentional relinquishment altogether, by the commissioners, of the provision requiring orders for such work and materials to be in writing. *Meyer* v. *Berlandi,* 53 Minn. 59, 54 N. W. 937; *Campbell* v. *Kimball,* 87 Neb. 309, 127 N. W. 142; *Emslie* v. *Livingston,* 64 N. Y. Supp. 259, 51 App. Div. 628.

The question of waiver was one of fact for the jury to determine. *Findeisen* v. *Metropole Fire Ins. Co.,* 57 Vt. 520. The effect of such a waiver, if established, was to strike out the two words *in writing,* leaving the wording of the rest of the contract unchanged and in force, (*Young* v. *Jeffreys,* 4 Dev. & Bat. 216, 20 N. C. 357; *O'Loughlin* v. *Poli,* 82 Conn. 427, 74 Atl.

763,) and then any form of order by the owners or their representatives was sufficient, and any extra work found necessary to perform, covered by an order (verbal or otherwise) from the proper source, in the language of the specifications, "will be paid for at actual cost, plus 10%." With the said two words "in writing" thus eliminated, the provisions of the second clause under the same heading, "Extra Work," in the specifications, are none the less applicable, for then, as before, the last two words therein, "such order," have reference to the kind of order required by the first clause. In such circumstances, the provision that the extra work "will be paid for at actual cost, plus 10%," constitutes an express promise to pay therefor, and fixes the manner of arriving at the amount. Consequently no occasion arises for discussing the question of an implied promise.

The particular respects mentioned by defendant under the fourth ground of its motion for a verdict, (as relied upon,) were: (a) the failure to install in the new plant, according to the plans and specifications, the "clean-out gate now in the old plant"; (b) the failure substantially to set the penstock "to grade and level as shown on plan," as required by the contract, the upper section of the penstock, for a distance of two hundred feet, being out of the grade and level "shown on the plan"; (c) the failure of the plaintiffs to comply with the contract requiring that "excavated material not used in the construction of the dam shall be placed around and over the penstock, thoroughly tamped and puddled to be placed there after tube is tested under full head of water," the motion further stating that "whereas the uncontradicted evidence is that much of the penstock was covered with frozen material, and that none of that material was either tamped or puddled"; (d) that by the contract, the work was to be completed "on or before November first, 1906," whereas it "has never been completed," and the work, incomplete, "was not turned over to defendant, till about December 10, 1907"; (e) that plaintiffs lined the penstock with concrete, instead of asphalt as required by the contract.

As to the failure to install the clean-out gate from the old plant, the plaintiffs' evidence tended to show that they acted in entire good faith concerning it; that if the gate had been available, it would have been put in, but it was found that the frame of it did not fit and that new patterns would have to be made, by reason of which plaintiffs were delayed in the matter

before the water was let into the penstock and possession of the new power-plant taken by defendant, after which the installing. of the gate was not practicable and could not be done when the plant was in operation; that plaintiffs never made any request to have the operation thereof stopped and the water shut off, to allow them to put the gate in, nor did defendant ever offer to do so; that the matter of this gate not being in was never mentioned to plaintiffs until in January, 1908, when talk was had about final estimates, which was after defendant had been in possession for some weeks, and plaintiffs then understood that the work was complete and the contract fulfilled. The plaintiffs' evidence tended to show that the inspector stood by and saw the work going on from day to day, knew that the gate mentioned had not been installed; and fully understood that in the respects mentioned under the above subdivisions b, c, and e, the work was being done in a manner different from that called for by the contract, and made no objection thereto, by reason whereof the plaintiffs were led to understand that defendant waived a strict performance in those respects. The trial court ruled, and we think rightly, that as a matter of law the inspector was the representative of the commissioners in this respect. Plaintiffs' evidence also tended to show that with full knowledge of such failures to perform strictly according to the terms of the contract, defendant voluntarily accepted the work as fully performed, took possession of the structure, thereafter retaining and having the beneficial use of it. Such being the tendency of the evidence adduced by the plaintiffs, a verdict could not be directed for any of the reasons stated under subdivisions a, b, c, or e. *Austin* v. *Wheeler*, 16 Vt. 95; *Morrison* v. *Cummings*, 26 Vt. 486; *Seargent* v. *Seward*, 31 Vt. 509; *Austin* v. *Austin*, 47 Vt. 311; *Viles* v. *Barre & M. Traction & Power Co.*, 79 Vt. 311, 65 Atl. 104.

The ground presented by subdivision d was the failure to complete the work within the time specified in the contract. Yet this does not defeat the plaintiffs' right of recovery; for the defendant allowed the work to go on after the expiration of the time limited the same as before, with its inspector in charge, thereby treating the contract as still in force. This was a waiver of strict performance as to time, and although in the circumstances of this case the defendant may or may not be entitled to a reduction for damages suffered by reason of the delay, it can

not by this technical objection defeat the action. *Smith* v. *Smith,* 45 Vt. 433; *Foster* v. *Worthington,* 58 Vt. 65, 4 Atl. 565.

The motion for a directed verdict was properly overruled.

## IV.   Exceptions to Remarks of Counsel.

The first witness called by plaintiffs, was engineer McIntosh, who testified to making the plans, exhibit B, and as to certain of their principal features.   At the close of his examination, Mr. Stickney, one of plaintiffs' attorneys, called the attention of the jury to some provisions of the plan, in connection with which he said, "You notice particularly, gentlemen, 'to the lines and levels and in the manner called for in the plans and specifications,' to show what that is, inasmuch as this plan is a part of the contract, here is the level contemplated by the specifications, that comparatively even line along there." Mr. Redmond, of counsel for defendant, objected to this, saying "the lines and levels to which the dam shall conform are not the lines and levels given on there as the condition of the surface of the bed of the stream." Mr. Stickney replied, "As to that all I have to say, your Honor, is, that we depend on the court to instruct the jury as to what the language is, and I am merely calling the attention of the jury to these plans and to our claim in reference to that language. My brother reminds me of the attorney who objected to evidence, and 'why,' says the judge, 'do you object?' 'Because it has a tendency to prove the plaintiffs' case, your Honor.' No evidence is admissible to prove the plaintiffs' case.   There is nobody here but the village of Morrisville, embracing the whole community, and casts it out"—Defendant excepted on the ground that it was meant to prejudice the jury as to the village of Morrisville.   The only defendant was that village, and it must have been evident to the jury that it was defending the case as best it could.   It is not apparent how the defendant could have been harmed by the remark.

James W. Rollins, a civil engineer, was called by plaintiffs as a witness and testified as an expert on the question of the possibility of making an estimate of what it was worth to excavate and fill the pocket, and in answer to the question, what he could do under such circumstances, as a contractor, in getting at what would be a fair price, answered, that their policy had

been to go ahead and do the work and keep track of what it cost, and then expect the other party to pay for it. Objection was made to the last part of the answer, whereupon Mr. Stickney said, "Strike it out—we admit expectations are different in reference to Morrisville than anywhere else, but all the same we have our expectations that they want to do the right thing by us, and I hope they will." Mr. Redmond excepted to the "running comment" of plaintiffs' attorney. Whatever might be said respecting the fore part of the remark objected to, if it was likely to have any harmful effect taken alone, it was rendered ineffective by what followed.

During the direct examination of George Dalrymple, a witness for plaintiffs and with whom they had contracted to install the penstock, he testified to sending specifications to Mr. Slayton; that he addressed three or four letters and received some letters. He was then asked from whom he received them. Objection being made by counsel for defendant, the court asked whether there was any objection other than that the Slayton spoken of was the inspector. Mr. Redmond answered that he was the same man, but no objection on that ground. Thereupon Mr. Hulburd, of plaintiffs' counsel, said, "And he stood on the bank from snowdrift to snowdrift all through the last year."—To this remark defendant excepted. As already stated, Slayton as inspector had charge of the work and was constantly at the place of the building of the dam when the work was in progress. This exception is too frivolous for notice.

In the direct examination of plaintiff Varnum, he was asked whether others besides the commissioners were present during the work of excavating the pocket, people whom he knew, and answered in the affirmative. Upon objection being made, Mr. Stickney stated that the evidence was offered as bearing on the question of knowledge, and on the supposition that the people of Morrisville have common intelligence and knew what they saw, as bearing upon the probabilities of the commissioners having the knowledge which "we declare they had," and that a great many residents of Morrisville were present from time to time watching the progress of the work as it went along. Mr. Redmond then said no inference could be drawn against the village of Morrisville in respect to this matter because of the presence of anybody except possibly the commissioners themselves. Mr. Stickney thereupon said, "Well, we will waive it

if my brother thinks the people of Morrisville are so exceptional in their characteristics from the rest.'' To this remark defendant excepted. We do not see how prejudice could have resulted to defendant therefrom.

During the direct examination of David Williams, an expert engineer called by plaintiffs, he was asked whether as an engineer he should say that section AB was a typical section of the construction required, or that it was the section of a certain specified portion of the dam. To this Mr. Redmond objected saying that what in scientific language that plan purports to show, was proper; that he thought the witness would say that in scientific language it showed that section AB was a particular spot on the dam. ''It may lie, but it says so. My point is, it is not what he shall say it is, but what the plan says it is. The question is what it purports to say, and not what anybody has an opinion it is.'' Thereupon Mr. Stickney said that was not the question; that the question was entirely different, and was ''designed to elicit the truth rather than have the lie prevail.'' To the last part of this statement exception was taken. In view of the declaration of defendant's attorney concerning section AB, ''It may lie, but it says so,'' we do not think the statement to which the exception points was so far afield as to be subject to much criticism.

During the direct examination of plaintiff Varnum, he testified that after plaintiffs were down from six to eight feet in the pocket commissioners Morse and Slocum came down to the place of work and, with inspector Slayton present, told the witness they wanted the dam built a foot thicker, because the pocket required the going so much deeper than was on the plans and than they expected. Counsel for defendant objected on the ground that by the contract any change must be covered in writing, and not less than a majority of the commissioners could make such change or variation. Plaintiffs' attorney stated that if the directions were so given and the work done in accordance therewith and the work accepted by the village, it would amount to a ratification of the directions given by the two commissioners with the inspector present. Thereupon one of defendant's attorneys entered into a discussion which, after it had proceeded to some considerable extent, was objected to, Mr. Stickney saying: ''I object to this gentleman's arguing his case before the jury when no such claim appears yet on the

plaintiffs' theory of the case. We are not putting in a defence to avoid payment of a just debt; we are putting in our claim of what the facts actually were, and in line with that, claim this evidence is perfectly legitimate which tends to prove it. It does not tend to prove what, we say, is a false defence, concocted to avoid the payment of a just debt.'' Defendant excepted ''to these remarks.'' It is very apparent that the remarks of plaintiffs' attorney, to which the exception was saved, were provoked by the improper discussion of defendant's attorney. That this was so understood by the trial court at the time, is manifest from its remarks upon the impropriety of such discussion. In these circumstances, defendant can not be heard to complain. *McMullin* v. *Erwin,* 69 Vt. 338, 38 Atl. 62; *State* v. *Slamon,* 73 Vt. 212, 50 Atl. 1097, 87 Am. St. Rep. 711; *Moore's Admr.* v. *Cross,* 86 Vt. 148, 84 Atl. 22; *Fadden* v. *McKinney,* 87 Vt. 316, 89 Atl. 351.

## V.  ORAL EVIDENCE BEARING ON CONSTRUCTION OF CONTRACT.

Plaintiffs' expert witness Rollins, in addition to being a civil engineer by profession, was a contractor of large experience in work of construction of dam foundations, building piers, docks, etc. After testifying that his experience as an engineer and building contractor had been such as to call upon him to examine plans and specifications and contracts, with a view of determining the work to be done, and being handed exhibits A and B, was asked: ''Q. 'Excavations will include all grubbing, clearing earth and rock excavation necessary for a proper foundation for the penstock, to be placed to grade and lines on plan; the removal of all earth and rock and a sufficient amount to secure two trenches in solid rock as shown on drawing for foundation for the dam, and to secure a foundation for flume and floodgates and clear approaches to the same to a level as shown on plans.' Now I ask you, calling to your aid your experience as an engineer, and having in view the requirements of the specifications, to take the plan exhibit B and tell me whereabouts on that plan is the bottom line of the construction called for?'' (Showing witness the profile line on the fourth page of exhibit B). Objection being made, counsel for plaintiffs said it was for the information of the jury, from a man accustomed to that kind of business, and upon the assumption that the construction

of a dam is expert work and not such work as a man of ordinary affairs is accustomed to. The objection was made upon the ground that the question called upon the witness to construe the contract, which was a question for the court, and it was for the court to tell the jury what it meant and whether the plans represented on the part of the owner the condition of things existing in the bed of the stream at the time of the bidding and of the making of the contract; that if it was a question for the jury, then the witness was asked to assume the province of the jury. The court said they did not understand the question to call for a construction of the contract, but it was offered to remove an ambiguity; that there were certain lines on the map about which counsel dispute, which lines were meaningless without some explanation to the court and jury. To permitting the question, exception was saved. The witness answered, "In my judgment and opinion the line shown on the plan is the line of the bottom of the excavation for the dam." Against a like objection and exception, the witness was then asked: Q. And what line is that, won't you describe it by the figures against it, if you please? and answered, "It is the profile line. It is technically the profile of the river bottom at the site of the dam, and it gives the elevations at various intervals clear round."

In *Clifford* v. *Richardson,* 18 Vt. 620, the action was trespass on the case for damages resulting to plaintiff from failure of defendant, a mill-wright, to construct and put into plaintiff's sawmill, as agreed, certain wheels and gearing in a workmanlike manner. Defendant completed his work upon the mill in the month of September, and the mill was set running in the month following, but alterations were made in March or April of the next year, after which the mill would saw about twice as much, in the same time, as it would before. Plaintiff proved, by the opinion of one witness, that if defendant had performed his contract so as to have avoided the necessity of making the alterations, the mill would have sawed a certain number (giving it) of thousand feet of lumber more than was sawed between the time when the mill was set running and the time of the alterations, without any additional expense to the plaintiff for taking care of it. Upon this evidence, the fact was found that the mill would have earned the plaintiff, if the machinery had been constructed in a workmanlike manner by the defendant, a certain number of dollars more than it in fact earned. It was

contended in this Court that if damages were recoverable on this ground, they were found without legal and admissible evidence, being based upon evidence of opinion merely.  Royce, J., writing the opinion, said the rule certainly is, that witnesses are to testify to facts, and not give their individual opinions; but that this rule has its exceptions, some of which are as familiar and as well settled as the rule itself; that when all the pertinent facts can be sufficiently detailed and described, and when the triers are supposed to be able to form correct conclusions without the aid of opinion, or judgment from others, no exception to the rule is allowed.  ''But cases occur, where the affirmative of these propositions cannot be assumed.  The facts are sometimes incapable of being presented with their proper force and significancy to any but the observer himself,—as in cases involving the question of insanity; * * * And it often happens, that the triers are not qualified, from experience in the ordinary affairs of life, duly to appreciate all the material facts, when proved.  Under these circumstances the opinions of witnesses must, of necessity, be received.

''It is true, that, except in cases involving an estimate of the value of property, or of its use, the instances of admitting such evidence, on the latter ground here stated, are said to be limited to matters of professional science, art, or skill.  But this restriction has not· usually been applied in a rigid and narrow sense.  'In general, wherever the inference is one of skill and judgment, the opinion of experienced persons is admissible; for by such means, only, can the jury be enabled to form a correct conclusion.'  1 Stark. Ev. 153.  And it was laid down by Phelps, J., in *Lester* v. *Pittsford,* 7 Vt. 161—'The testimony of opinion may be given, where, from the general and indefinite nature of the enquiry, it is not susceptible of direct proof.'  We have no doubt, that, upon these grounds, the evidence was properly received.''  In *Dean* v. *McLean,* 48 Vt. 412, 21 Am. Rep. 130, the action was case for damage to plaintiff's milldam, flume, and bulkhead, occasioned by defendant's negligently and carelessly floating logs and timber therethrough.  The plaintiff was a witness in his own behalf, and testified to the manner in which defendant proceeded in opening the bulkhead and running the logs through the dam; also testified that he was familiar with the running of logs in that stream.  He was then asked what would have been a proper way to open

the bulkhead and run the logs through; and under exception answered that in his judgment the proper way would have been to leave the cap-piece on, and guide every log through. This Court, in an opinion by Barrett, J., said the objection to this evidence is fully answered by Royce, J., in the case of *Clifford* v. *Richardson,* noticed above; that "The running of the logs in that stream, and through that bulkhead, was not a matter of common knowledge, nor of adequate common judgment upon the facts shown by the evidence. The experience and observation of the plaintiff gave him the grounds and faculty of an opinion peculiar to himself, and not common to men who had no such experience or observation. In a substantial sense he may be regarded as an *expert,* having peculiar knowledge and skill, which renders his opinion worthy of consideration as the ground of judgment and opinion in others who have not such knowledge and skill." In *Brink & Co.* v. *Merchants & Mechanics Ins. Co.,* 49 Vt. 442, where one question was, whether the change of the occupation of the building destroyed by fire was to a more hazardous one, the plaintiffs produced the tenant of the premises as a witness, who was permitted to testify, subject to exception, that the risk was no greater by reason of the business he was carrying on at the time of the fire than it was when he was manufacturing toys, the business mentioned in the policy. This evidence was held to have been properly admitted, (upon the authority of *Dean* v. *McLean,*) the Court, Powers, J., writing the opinion, saying that the tenant "had charge of all the business carried on in this manufactory, and had special opportunity to know and did know all the details and processes of the manufacture of these goods, and the liability to fire and as to these facts within his peculiar knowledge, he was a competent witness."

In the instant case, the practical experience of the witness as a civil engineer and as a building contractor had been such in connection with work similar to the work in question, that he had been much called upon to examine plans, specifications, and contracts, to determine the work to be done. Using the language of Barrett, J., in *Dean* v. *McLean,* so far as applicable, the building of the foundation for the dam "according to the plans and drawings," was not a matter of common knowledge, nor of adequate common judgment upon the facts shown by the other evidence. The experience of the witness gave him

such grounds and faculty of an opinion peculiar to himself, and not common to men without such experience, as to give him peculiar knowledge and skill, which rendered his opinion worthy of consideration as the ground of judgment and opinion in others not having such knowledge and skill. We think the rulings admitting the evidence were well within the holdings in the three cases noticed, and were without error.

In cross-examination the same witness was asked: Q. "That profile, referring to the last page of exhibit B, marked 'Profile across River at Dam', does not indicate to anybody who knows how to read a plan, the quality of the river bottom, whether it is rock or what not, does it?" and answered, "If anybody saw this plan without seeing the location, they might be in doubt." In redirect examination the question was asked, "Now you answered Mr. Redmond, referring to the diagram at the right-hand side and top of the fourth page of exhibit B, that one who had not seen the site would be in doubt as to what was indicated by that profile line which was referred to, as being the character of the surface which that line indicated. Now to one who has seen the site what was there in the site that would leave them without any doubt, if there was anything?" Defendant objected to the witness giving his opinion on this, on the ground that it was incompetent for him to tell what the plan means, with the element of viewing the situation. The question was permitted, and we think not erroneously, on the ground that it was but a development of the subject about which inquiry was made in cross-examination. The witness answered, "On my examination of the site, an examination of said documents would lead me to believe that that was the line of the work, and that shows the rock line." He was then asked whether the figures (indicating elevations) along underneath the straight line at the "Top of ice March 9, 1906," would have anything to do with his arriving at his conclusion, and answered, "As an engineer I should say that those figures meant that they found a bottom which satisfied them, otherwise they would not go into it in such detail." Defendant objected to this answer as not responsive, and asked to have it stricken out, or under exception. The court ruled that if it had any bearing it would be admissible though it might not be responsive, and let it stand, to which exception was saved. There can be no doubt that the answer had a bearing in the case, and it was within the discre-

tion of the court to let it stand. *Stacey* v. *Dolan,* 88 Vt. 369, 92 Atl. 453.

Frank O. Sinclair, a civil engineer of long experience, of experience in furnishing designs of construction, and familar with construction of the character of the dam in question, was called as a witness by the plaintiffs, and his attention being called to section AB (as shown on the second page of exhibit B) was asked whether, looking at it he could tell from the plan, considering the whole plan together, what that section purports to be, and answered that he could. He was then asked, "What is section AB?" The question was objected to on the ground that the witness "should be asked what that plan says section AB is." The witness answered that it seemed to him to be a typical section. This was only another way of saying that in his opinion it was so. Expert evidence of this character relative to that section was introduced by both parties, and was important in the case, as showing what the plans and drawings called for throughout the spillway. In cross-examination it was brought out that section AB purports to be a section of the spillway at a point about twelve feet east of the east end of the bulkhead; that it is typical of the form of the spillway, that the spillway shall have two trenches in solid rock, and that the spillway shall be founded on solid rock; that it is also typical of the form and thickness of the foundation below the point of the toe, and if the head of the dam is laid so as to go below that point it should be at a batter of 1 in 1½ on the side downstream. The witness was also cross-examined in considerable detail concerning indications of bed-rock as the required foundation appearing on the drawings of different sections of the dam, including. AB, shown on the first, second, and third pages of exhibit B, and as to where the typical section AB of the spillway would come with reference to the profile line as shown on the fourth page of that exhibit. The cross-examination continuing. Q. Now is there anything on these plans anywhere to indicate the quality of the surface of the ground, that is indicated by that profile line? A. The profile line does not indicate anything about what the surface is. Q. Now my question is, is there anything on these plans anywhere that indicates what the surface of the ground along the elevations is, on that profile line? A. Not unless you get it off of the typical section, or the section that is here. Q. There is nothing in the typical section

which says what is the condition of the soil or the ground along that profile line, is there? A. Should be founded on bed-rock, that is the only thing it says. Q. And all that AB says about the condition at the base is, that you must go to bed-rock? A. Well, it says it is founded on bed-rock. Q. Yes, that it is founded on bed-rock? A. And it says to me that a dam of that height will reach bed-rock. Q. Yes. Is there anything on the profile, in the right-hand corner of the last page of exhibit B that indicates the elevation of rock along that profile line? A. There is only one line, as shown, which indicates to me that that line shown there, was expected to be rock, or the foundation of the dam. Q. I am not asking you that. I am asking you if there is anything on that profile line that shows the elevation of any rock? A. Does not show anything as far as character. In redirect examination, the witness was asked. Q. Now I ask your attention again to the plan in view of Mr. Redmond's inquiries to you in reference to the typical section, and limit you to that alone—I will ask you in the first place you have seen this situation, have you? A. Yes, sir. ·Q. Would you be able as an engineer from that to understand, from your experience, observation, and knowledge as an engineer, what the character of the surface of the ground below what is marked as "Top of ice March 9, 1906, 81 feet and 2 inches," is represented to be? Subject to exception, the answer was taken, "I think so." Q. Now Mr. Sinclair, you have spoken of the typical section of that plan; can you from that typical section and the diagram on the fourth page, taking into consideration all the features of the typical section, that the height is indicated by an unbroken line, with the hatching at the bottom of it, and taking that in connection with the little diagram at the upper right-hand corner of the fourth page, can you as an engineer tell us what, taking the whole plan together, the surface at the bottom of the river is represented to be? just answer that by yes or no. Subject to exception the witness answered, "Bed-rock." It seems clear that in view of the cross-examination shown above, these questions were properly permitted in redirect examination. They were along the same line and of the same character.

Plaintiff Varnum, fifty-nine years old, and a contractor in railroad work during most of his life, on being asked whether the figures on the profile, fourth page of exhibit B, indicating levels, were to be reckoned as exact, or as variable quantities,

answered, "Each figure." He was then asked whether in an estimate each figure was to be treated and used as exact, or with a variation. This question was objected to on the ground that it called for a construction of the plans, and an exception was noted. He answered that it was to be used exact, at a point upon which it sets. Q. You have already testified that there was expected to be upon the surface of the stream, loose material; that according to your original expectation, assuming the bottom of the stream was bed-rock, you expected it would be swept off and not have to be taken away in buckets. Now what I want to get at is, whether as a contractor taking that plan to assume quantities, and following the rule which you just stated of taking these figures as exact, does or does not this matter of a foot extra play any part, do you have to make any deduction and afterwards subtract from it for this foot extra, or is the foot extra taken into consideration in arriving at the figure which shall be placed on the plan, which? Objection was made to the question as involving not only a construction of how they would construe the contract, but some opinion of how the people who made the contract wanted them to do. The court ruled that in part the question called for the witness's interpretation of his answer, of what he meant by the "exact," and permitted it to be asked. The answer was, "These levels or elevations mean to me soundings, the deepest sounding taken to bed-rock, and the foot or six inches or whatever it may be was above those levels." Q. So that in getting at the quantity of excavation for which you claim to recover in this case, it is to be arrived at without any deduction from what is found to be the cubic contents of the entire excavation and fill below what is represented on this plan C as being the base line—is that right? The answer was received subject to exception. Q. Am I right? A. You are.

No question is or can be made but that it was properly shown by expert testimony that the word "levels" has, in engineering, a technical meaning, and what that meaning is. The questions to which these exceptions were taken, asking whether the figures indicating "levels" on the plan were to be taken in their technical significance as exact, or as variable quantities, were in essence of the same expert character. The purpose of them was to get a more definite scientific meaning of

the word "levels," as indicated on the plan by figures. We think the evidence was properly admitted.

## VI. EVIDENCE ADMITTED ON THEORY THAT DEFENDANT WAS AFFECTED BY NOTICE TO INSPECTOR.

The questions here raised involve the relation of agency by previous appointment and also by subsequent ratification. The specifications state that "the term inspector refers to the inspector in charge of the work, appointed by the water and light commissioners"; that to prevent disputes, etc., "concerning any estimates or orders that may be made by the owners or inspector," it is understood, etc.; that "any directions given by the owner, or inspector, to any foreman who appears to be in charge of the work, shall be valid and binding upon the contractor * * *"; that "whenever the owner, or inspector, shall inform the contractor in writing that any foreman, or workman, in his opinion, is incompetent * * * such foreman or workman shall be discharged from the work * * *"; that "the contractor shall give all necessary assistance at all times for the proper inspection of the work by the owner or inspector"; that "the inspector, with the approval of the engineer, shall be the judge of the progress of the work and his decision shall be final and binding on the parties thereto"; that each dowel rod of iron shall extend down into solid rock four feet or more "at the discretion of the inspector"; that cement shall be "subject to such tests as the inspector may direct and determine and must be accepted by him before being used. The inspector shall be notified at once of any new shipment of cement * * * Any cement not showing a test satisfactory to the inspector shall be at once removed from the works"; that "if necessary * * * sand shall be washed and screened to the satisfaction of the inspector"; that "suitable iron gates," etc., "provided and installed in a manner satisfactory to the inspector"; that "the 3 ft. clean-out gate * * * shall be placed * * * gate stem lengthened and the gate hoist installed all in a manner satisfactory to the inspector"; and that "upon the completion of the work the contractor shall clean up all rubbish and unused material and leave the site clean and to the satisfaction of the owners or inspector." The foregoing instances show pretty clearly the broad scope of authority expressly given to the in-

spector under the written contract; and the express authority so given to do the things specified, carried with it by implication authority to do all acts which might be necessary for the purpose of effecting the objects for which the express authority was given. *Vermont Marble Co.* v. *Mead,* 85 Vt. 20, 80 Atl. 852.

It was within the contemplation of the parties at the time the contract was executed that it might be found necessary to perform work and to furnish materials not covered by the specifications and the contract, hence the provisions respecting the form of order as a prerequisite to municipal responsibility, and the basis of arriving at the sum to be paid therefor. The inspector was in charge of all work required by the contract, and also of all work not within the contract but found necessary, and performed under an order by the owners or their representatives. Mr. Morse, one of the commissioners and called by defendant, testified in cross-examination as follows: Q. Now was there anything in particular that called your attention to that fact that what had been filled and excavated (in the pocket) at that time, or was that merely the result of your observation from day to day? A. There was a little talk about it that— why I remember they were pretty anxious to get above where if the coffer-dam went out they would not have trouble, something of that kind, before winter set in. Q. And when you say there was a little talk about it, you mean there was talk which came to the ears of the board of water and light commissioners? A. Through Mr. Slayton talking, Calvin Slayton. Q. And by the way, I suppose you expected from Mr. Slayton to have accurate accounts from week to week as to how the work went on? A. Sure. Q. It was his business to keep you informed was it? A. Yes, sir. Q. And did he so keep you informed as far as you know? A. Yes, sir. Q. And when you would go up there after having heard Mr. Slayton's reports, your observations would conform to what Mr. Slayton had told you? A. Yes, sir. Q. So that you have no doubt but that you received from Mr. Slayton a fairly correct and ordinarily accurate account of what the contractors were doing from day to day? A. I suppose we did, yes sir. Q. That was the purpose for which, I suppose, he was inspecting, wasn't he? A. Yes, sir. Q. As you understood it? A. Yes, sir. Q. Now did you yourself, Mr. Morse, ever give instructions to anybody as to how the work should be done by the contractors? A. You mean to Mr. Varnum

or Mr. Badger, give instructions to them, you mean? Q. Yes, that is what I mean. A. No, sir. Q. Whatever instructions they received in the ordinary course of the business, you expected they would receive from Mr. Slayton, did you? A. Yes, sir, as the result of our decisions on matters, we sent word by Mr. Slayton.

The evidence received to which the exceptions under this head were taken, may be stated in brief as follows: Subject to exception on the ground that inspector Slayton could not bind defendant by receiving notice, nor by conduct, except as provided in exhibit A, and because he was not an officer of defendant village of any kind, and in no way authorized to bind the village in any particular outside of this contract, the contractors' foreman Badger testified to the discovery of the pocket, and that he then said something to plaintiff Douglass about it; that while thus talking to Douglass, the inspector joined them and took part in the conversation; that Douglass then called the inspector's attention to the condition of the work, "and told him that I said we were below the grade line, and asked why not put in the concrete there, and go ahead with the building of the dam; and that Mr. Slayton says, 'that won't do, you must go to bed-rock.'" Under like exception, Douglass testified to the same effect.

The plaintiffs' witness George Dalrymple was a manufacturer of steel penstocks and a contractor, and had installed the penstock at the dam in question, under a contract with the plaintiffs. He testified to being at Morrisville in May, 1906, to examine the site of the proposed dam "in connection with the penstock, * * * to see what was to be done in connection with the laying of this pipe," and reported to Mr. Slayton on the ground, "right there"; that upon an examination of the spot he found that before his "work could be placed this rock would all have to be removed." He was then asked whether there was any discussion between him and Slayton in that regard, and against exception on the ground of immateriality answered in the affirmative. He testified (without objection being made) that he furnished his specifications for the penstock, at the outset, "To Mr. Slayton representing the village of Morrisville, I supposed." Later he was asked to whom he furnished his specifications, and answered, "I supposed I furnished them to the village of Morrisville." Defendant asked to have this

answer stricken out, and to the refusal of the court saved an exception. The answer was not unlike in substance the one previously given, to which no objection was made. The exception is without force. The witness further testified that he sent specifications of the penstock to Slayton, and there was some correspondence, "should say might have been three or four letters written" before the specifications were sent; that he addressed three or four letters, and received some letters. He was then asked from whom he received them. Objection was made, but the evidence was admitted as bearing on the question of agency, to which exception was noted. The witness answered, "From Mr. Slayton." He further testified to delivering the specifications in person to Slayton, and subject to exception that it was "At somebody's office in" Morrisville,—further stating in answer to questions, that Mr. Fleetwood, the attorney of the village, Slayton, and two ·of the commissioners, being Mr. Stafford and either Mr. Morse or Mr. Slocum, were there present; that they all talked over the matter of putting in the penstock, and that the plans and specifications were also talked over there; that he was there about an hour, talked about price and character of work, left the specifications there, and had not seen them since; that he never furnished any other specifications than those that were thus delivered to Slayton and the people present in the office on that occasion.

Lewis A. Wheelock, a witness called by plaintiffs, testified to working for plaintiffs in the construction of the dam; that his work was building and looking after the coffer-dam; that he was there at the time the pocket was discovered. Against exception on the ground that Slayton had no authority to bind the village, except to pass upon the quality of the work done as the contract provides he shall do, the witness testified that he heard conversation between Slayton and some of the bosses, or Mr. Varnum, or Mr. Douglass, in regard to the pocket, in which Slayton said, "It must go down to the rock, or it has got to go," one or the other; that after work was begun and the pocket was being excavated below the profile line, Slayton gave directions as to the way and manner in which some part if it should be done; that Slayton wanted the witness to see that one corner was cleaned out before the concrete was put in, which witness did; and on other occasions the witness saw Slayton go and look in, and heard him say they could not dump any on there until

they had cleaned that out a little more; that Slayton went off and in a few minutes one of the bosses came with a man and told him to get in and clean it out.

All the evidence mentioned above under this heading, as excepted to, had a bearing on the question of agency, and was properly received. In *Fay & Bryant* v. *Richmond,* 43 Vt. 25, it was said in an opinion by Peck, J., "If one acts for, and in behalf of another, it is immaterial to this question of agency, so far as third persons are concerned, whether he acts by his direction and request, or by his permission merely; he is equally his agent in both cases." And an agency need not necessarily be established by direct evidence. "It may be established by circumstances, such as the relation of the parties and their conduct with reference to the subject-matter of the alleged contract." *Lindquist* v. *Dickson,* 98 Minn. 369, 107 N. W. 958, 6 L. R. A. (N. S.) 729, 8 Ann. Cas. 1024. "It is a general rule that the authority of an agent is enlarged by implication as to third persons if the principal allows him to act as his agent beyond his authority without objection. In that case, the principal is bound by estoppel to those who deal with the agent as such within the apparent scope of his authority, and are not aware of any want of authority in the matter." *Keyes & Co.* v. *Union Pacific Tea Co.,* 81 Vt. 420, 71 Atl. 201; *Valiquette* v. *Clark Bros. Coal Min. Co.,* 83 Vt. 538, 77 Atl. 869, 138 Am. St. Rep. 1104, 34 L. R. A. (N. S.) 440; *Walsh* v. *Pierce,* 12 Vt. 130; *Landon* v. *Proctor,* 39 Vt. 78. The mere fact that a person assumes to act as the agent of another is not sufficient to show such agency; but if his acts are so open and notorious that they must have been known to the one for whom he assumed to act, they are evidence of agency. *Black Lick Lumber Co.* v. *Camp Construction Co.,* 63 W. Va. 477, 60 S. E. 409. "The scope of the agency is to be determined not alone from what the principal may have told the agent to do, but from what he knows, or in the exercise of ordinary care and prudence ought to know, the agent is doing in the transaction." *Kingsley* v. *Fitts,* 51 Vt. 414. It is said however that what took place between the witness Dalrymple and Slayton relative to the specifications for the penstock, was before the contract between the defendant and the plaintiffs was entered into, and therefore inadmissible. But the evidence in the case shows that Slayton was acting for defendant in connection with the matter of con-

structing the proposed new dam as early as March, 1906, when the soundings of the river bottom were taken, ever continuing thereafter, and the testimony of Dalrymple was to the effect that the specifications delivered by him to Slayton, and the plans, and putting in the penstock, were discussed on the occasion mentioned when he, Slayton, the attorney for the village, and two of the commissioners, were present and all taking part therein; and it was fairly inferable that those specifications were received by the board of commissioners with knowledge of what Slayton had done respecting their procurement. The evidence, therefore, tended to show agency on the part of Slayton in procuring those specifications, (*Dickerman* v. *Quincy Mut. Fire Ins. Co.*, 67 Vt. 609, 32 Atl. 489,) and in view of the relationship thereof with his acts and doings in connection with the work of building the new power-plant, it can not be said that the evidence to which objection was made, had no bearing on the question of agency involved in this case. See *Keyes & Co.* v. *Union Pacific Tea Co.*, cited above; *Thompson* v. *Clay*, 60 Mich. 627, 27 N. W. 699.

The legal effect of knowledge by inspector Slayton, or notice to him, upon defendant, is sufficiently covered by our discussion later of the effect of knowledge by or notice to the individual commissioners, or less than a majority of the board.

VII.   EXCLUDED EVIDENCE OFFERED ON ISSUES OF WAIVER, ESTOPPEL, AND IMPLIED CONTRACT.

The exception upon which defendant particularly relies under this head, was taken to the exclusion of the offered testimony of witness C. A. Gile, one of the commissioners, who had testified to being at the site of the dam at the time the pocket was being excavated and filled, and that he said nothing to Mr. Varnum about the pocket; that he then understood the pocket was to be excavated and filled under the contract, and made no protest to Mr. Varnum, because witness supposed it was being so done. He was then asked how he understood that Varnum understood that work was being done. Objection being made, defendant offered to show by the witness that during all the time the pocket was being excavated and filled, he understood that the plaintiffs understood that they were doing the work of excavating and filling that pocket because the written contract

required them to do so; and under this offer asked the question: "Mr. Gile, during the time Mr. Varnum was engaged in excavating and filling this pocket, what did you understand his understanding was as to how this work in the pocket was being done, was to be paid for, whether it was done under the contract and in accordance with the terms of the contract, or whether it was done as extra work?" The plaintiffs' objection was, not that defendant could not show what it was trying to show, but that it could not show it by the witness without first showing the basis of that understanding, that is, the facts upon which he arrived at the conclusion as to what Mr. Varnum's understanding was. In answer to an inquiry, counsel for defendant stated that they intended no other foundation than was already laid upon the testimony in the case. The question was excluded, and defendant excepted. Our attention has been called to no evidence in the case laying a foundation for such testimony by the witness. The question called for nothing but his opinion, and was rightly excluded. The case of *Linsley* v. *Lovely,* 26 Vt. 123, is full authority. There the plaintiff was a merchant in the city of New York, the defendant a merchant in Burlington, this State. The plaintiff sought to recover the amount of two bills of goods, severally sold by him to defendant on two different days. Defendant offered the deposition of his clerk, (whom he sent to New York to purchase goods,) tending to show that he bought the first bill of goods on a credit of six months, and that it was so understood at the time of the purchase. Those parts of the deposition tending to prove that the goods were so bought and that.the plaintiff, or his clerk, so understood it, were objected to by the plaintiff, admitted by the court, and exception saved. This Court said the testimony of the witness as to how the contract was understood by the plaintiff, and that he, or his agent, understood it to be a sale upon six months' credit, was only the opinion of the witness, and that the admission of this part of the deposition was error.

VIII.  OTHER EXCEPTIONS TO THE ADMISSION AND EXCLUSION OF EVIDENCE.

Under this heading of the bill of exceptions there are recited groups of exceptions, numbered from 5 to 33 inclusive, and these groups are considered here in their numerical order. ·

5.    It will be remembered that the plaintiffs' witness George Badger was in the employment of the plaintiffs from a time before they put in their bid for the work to be done under the written contract to the time when the constructed dam was turned over to the defendant, and that he was the plaintiffs' foreman on the job throughout.

In direct examination Mr. Badger was asked whether he had anything to do with assisting the contractors, or either of them, in arriving at the estimates of the expected costs of the work, and answered that he did.    He was then asked what he did in that connection.    The question being objected to, counsel for plaintiffs stated that what they proposed to show was merely historical, that the witness assisted plaintiffs in arriving at their calculations as to what would be a fair price for the different units of cost of the work in the aggregate lump sum, without details, in support of the allegation in the declaration that the contractors made estimates before giving their bid; as bearing upon the question of what happened later, and as bearing upon the issue raised by defendant's attorney that the surprising discovery of the pocket later, ought to have been anticipated before the contract was entered upon.    Defendant's objection was put upon the ground that when the contract was executed, it merged all that had previously transpired, and that the contract required plaintiffs to do just what they did do.    The evidence was received, and exception noted.    The further testimony of the witness in connection therewith, that he arrived at estimates, consulting the fourth page, upper right-hand corner, of exhibit B, and returned them to the plaintiffs, was also received under exception.    In these rulings there was no error. The evidence was admissible upon the material question whether the parties gave a contemporaneous and a subsequent practical construction of the contract that the foundation and the work specified was to be built to lines and levels shown on the plans, and that it was upon this understanding of the plans by the plaintiffs that they made their estimates.    This was in accordance with our holdings when the case was here before.    84 Vt. 312, 79 Atl. 391.

6.    This exception is waived.

7.    In direct examination the same witness was asked, referring to the soundings taken through the ice in March, 1906, as hereinbefore stated:    Q. Now in the investigations that you

made at that time, and those soundings that you witnessed, did you then come to any conclusion as to what was the material at the bottom of the stream right above where the pocket is indicated on plan C? Defendant objected on the ground that whether the witness drew a false or just conclusion from the investigations made, is not material. The evidence was received under an exception. The witness answered that he supposed it was rock bottom at every place where the soundings were made, all the way across. The result of this investigation was told by the witness to the plaintiffs before they executed the contract, entered into their consideration in making their bid, and the evidence was properly received. The further objection that it was not proper redirect examination, is of little consequence, since it was within the discretion of the court to receive the evidence at that time, though out of the regular order of things. *Wells* v. *Boston & Maine R. R.,* 82 Vt. 108, 71 Atl. 1103, 137 Am. St. Rep. 987.

8 and 9. One of the items in plaintiffs' specifications charged in connection with excavating and filling the pocket is, "Rent of Machinery, $2,226.40." One witness was permitted to testify that a double-drum hoisting engine, used in connection with such work, was worth as rent two dollars a day, and a derrick completely rigged with guys and falls was worth as rent four dollars a day. Another witness was permitted to state that the fair price for the use of a double-drum derrick, with a 7x12 engine, was six dollars a day. This evidence was received under exception on the ground that there was no evidence that plaintiffs used any other or different machinery in such work than they had there for the work as they understood and expected it to be, and consequently the questions did not state any fair test of the right to recover for the use of the machinery in this respect. We see no reason why the evidence was not proper upon the question of how much the plaintiffs ought in justice to recover for the use of the machinery in connection with this work, if outside the written contract. Reasonable compensation for the use of the machinery was a matter to be considered in determining the actual cost of such extra work. *O'Keefe* v. *St. Francis' Church,* cited above.

10. Plaintiffs' witness Wheelock testified that about July 26, 1906, under employment by plaintiffs, when their work of constructing the dam reached that point, he built the coffer-dam

in the stream so that it might be turned for work where the pocket developed; that just before he began to build the coffer-dam, he and others went out in a boat to discover a place suit-able therefor and "sounded all around." He was then asked what they were looking for and, subject to objection as imma-terial, answered that they were looking to see the nature of the bottom of the river, and under same objection, that they found it to be what they called rock bottom. This evidence was ma-terial as bearing upon the question of the possibility of ascer-taining the conditions beforehand without actual experiment, and the exception is without force.

11. Plaintiff Douglass testified to seeing the plans and specifications before executing the contract. He was then asked how he informed himself in regard to the conditions there before he executed the contract. Subject to exception on the ground of immateriality, he answered, "We went to look the work over. Q. When you say 'we,' whom do you mean? A. Mr. Badger. Q. You and Mr. Badger? A. Yes, sir. Q. In making the bid of Douglass & Varnum for this work, did you take into con-sideration what you had observed when you and Mr. Badger looked over the place where the construction was to be, as you have stated you did? A. Yes, sir. Q. Now when you looked it over did you satisfy yourself from your observation of the place and the information you then obtained, as to what the bottom of the stream was? A. Yes, sir. Q. And what did you take into consideration the fact to be as regards the bottom of the stream? A. Rock." We think that under our rulings in this case, when here before, all this evidence was material on the question of what steps the plaintiffs took to ascertain the character of the river bottom before making their bid, and also on the question of how the plans were understood by the parties at the time the contract was executed.

12-14. Plaintiff Varnum testified that before plaintiffs' bid was made he came to Morrisville, went into a certain office, and there saw plans and notes in regard to the dam; that he and Mr. Badger, after looking at the plans, went down to the site, spending perhaps two hours there; that the plans he saw, were exhibit B; that he saw in the office to which he went, besides Badger, all five of the commissioners, (except Judge Powers,) Mr. Slayton, and Mr. Douglass who came on a later train. He was then asked to state what the notes were, their character,

and whose they were. Objection was made on two grounds: (1) as immaterial; and (2) if he saw any notes, the notes were the best evidence of what they were. Counsel for plaintiffs stated that they did not expect to show the contents of the notes; that they proposed to show by the witness that in connection with his preliminary examination of this matter, he was shown notes purporting to be and represented to him in the presence of the contracting parties as the notes of defendant's engineer—merely the fact that in addition to the view of the premises and an examination of defendant's specifications, he also had as a guide to determine what he might or might not do, what was reported to him as being the notes of the engineer who had made the plans. The evidence was received and exception saved. The witness, "I understood them to be elevations and soundings taken at the site of the dam. I understood them to be Mr. McIntosh's." That this evidence was properly received for the purpose for which it was offered, was made clear (if doubt previously existed) by the testimony of the witness in cross-examination, that he understood they were the notes made of the work on the occasion McIntosh and Badger were down on the ice; that on the occasion in the office at Morrisville, when he saw the notes, one of the commissioners showed him the plans; that there was a general discussion by everybody there about the points of the work; that he then understood that the elevations marked on plan B, below the line marked "Top of ice March 9, 1906," were the elevations found by McIntosh and Badger the day on the ice when they made the soundings, and that in each case they were the elevations then found to be the elevation of the river bottom at that point; that they (commissioners) said as to the condition of the bottom of the river along the profile line, that "every thing was rock-bottom," "the foundation was to be solid rock"; that "they represented the soundings were taken through the ice, by which these levels were made; that that was the best possible opportunity to make soundings, and that the soundings were well made, every ten feet."

The witness further testified in direct examination that on the occasion named when he and Badger went down to the site of the dam, the latter showed him "where the surveys had been made. There were lines up, stakes, I think, on the line of the dam in as far as it was on the west side of the river; and I think there was one stake on the east side of the river, showing

where the east end was''; that he supposed that this line corre-
sponded with what information he ''had at the office''; that
''there was no evidence of any other survey there''; and as he
''understood surveys that was the line.'' The question was
then asked whether or not in what he did afterwards he acted
upon the assumption that that line was the line of the survey,
of the plan. To this question objection was made and excep-
tion saved, but no ground thereof was stated. The witness
answered, ''Yes. The only comment I would make is, that
when the actual work begun it was optional with Mr. McIntosh
that the line may have been moved a few inches, or may not;
but I never knew that it was.'' There being no ground of ob-
jection stated, the only question to be considered under this ex-
ception is, whether the evidence was material or relevant in any
state of the case. *Spencer* v. *Potter's Estate,* 85 Vt. 1, 80 Atl.
821; *Townshend* v. *Townshend,* 84 Vt. 319, 79 Atl. 388. The
exact location of the line of the proposed dam, established by
survey, was not shown by the plans nor by the specifications.
Knowledge of this line must have been essential to the plain-
tiffs in determining upon the bid to make. That line was
pointed out to plaintiff Varnum by the man who (according
to his testimony) worked under surveyor McIntosh in making
the survey; and no claim is made that the line so pointed
out was not the line of the survey, of the plan. Upon the
plaintiffs' theory of the case, it was material to show that, hav-
ing such information, they relied upon it as true in their subse-
quent actions.

Plaintiff Varnum further testified that he had never under-
taken to ascertain for himself the character of the surface of
the bottom of the river ''on the exact site of the dam.'' He was
then asked to tell what he did in that respect, and when and
where. Objection was made upon the ground that what ex-
amination he made of the river other than at the site of the
dam, was not material. Counsel for plaintiffs stated that they
expected to show by the witness, not an examination right on
what is called ''profile line,'' but right there where such an ex-
amination as the witness made would satisfy him that he had a
reasonably clear idea of just what the character of the bed of
the stream was where he was going to place the dam. Under
the offer, the evidence was received, and defendant excepted.
The witness answered that he did make such an examination

with Mr. Wheelock before the timbers of the coffer-dam were ordered, in order to get what was required for the dam; that that was on both sides of the site of the dam, about thirty feet each side. Having already ruled that the testimony of Mr. Wheelock touching the same examination, was properly received, it is not necessary to say anything in disposing of the exception now under consideration, except that in admitting the evidence there was no error.

15. Mr. Varnum further testified in direct examination, subject to objection and exception without any ground thereof being stated, that before signing the contract he sought such information as would bear on the work which was to be done; and that in pursuit thereof he talked with the commissioners. He was then asked whether he learned from them anything in reference to what they understood the bottom of the river to be. To this objection was made on the grounds that if the excavation of the pocket was within the terms of the contract, it is immaterial what the understanding was, either before or after the contract was executed; and besides the question bunches the commissioners and asks the witness if he learned from them certain things. The plaintiffs' attorney stated that they expected to show that at the meeting (mentioned above in the discussion of exceptions 12-14) when Varnum saw the commissioners, the matter as to what was the character or formation of the bottom of the river, was discussed in the presence and hearing of all of them, by any and all present; and that Varnum learned, at a time when all the commissioners were present and discussing this matter, what their understanding of the situation was—not with a view to showing the exact condition to have been so, but to showing what their understanding was. Under the offer the evidence was received, and an exception saved. The witness answered in the affirmative; and that at the first meeting mentioned by him, he learned what they understood to be the formation at the place where it was proposed to have the dam; that the character of the formation was referred to in the talk there; that all the commissioners, except Judge Powers, were present, the discussion was general with all of them, and within the hearing of all; that the character of the formation in the place where the dam was proposed to be constructed was then said to be rock; that rock was to be gone to everywhere, and that the plans showed rock everywhere excep-

ting on the west end where the witness had made personal observation; that in this discussion the plan exhibit B, or one like it, was used. The question was then asked, whether at this meeting, any line on this plan was spoken of by the witness or by the commissioners as being the base line to which the dam should be constructed, or (to put it in the other way) above which the foundation of the dam was to be built. The further objection was made to this question, that no claim is made in the pleadings of any representation in respect of what the foundation of the dam should be, except the representation made by the plans; and there is no claim of any representation as to the plans, except what the plans say. On this objection the court rules as follows: ''The plans and specifications provide that a dam should be built to lines and levels; and in another place the specifications provide that it should be constructed upon solid rock. Now if a dam is to be built to the lines and levels, and solid rock is there, then there is no ambiguity; if it is to be built to the lines and levels and there is no solid rock, then there is an ambiguity, because it can not if there is no rock at the lines and levels, and the contract provides that it must be built to the solid rock, then it is a question of construction resting upon a fact, because it can not be built to the lines and levels and upon the solid rock for the two are not there together. Our findings are made upon this matter upon the supposition that here is a condition stated in the plans and specifications and contract which is inconsistent in some respects, and to get at the interpretation of the contract it is necessary, as we regard it, to resort, even under the general allegation, to evidence to determine what the true interpretation is, and so if you make an objection here we will preserve your rights, and we so hold.'' An exception was taken to this ruling, also to the admission of the testimony. The witness answered, Yes, sir. Q. Will you point out (on exhibit B) what that line was, or indicate in some way, so that we may understand what that line was? A. The line beginning on the left of the plan—Q. On what page? The fourth page? A. On the fourth page, at the left-hand—Q. At what figures? A. At 100.35, and following around the base of it to the point marked 95.0, or about that point, where the rock disappears and the moss and grass and roots grew over it, from there 95.0 to the end of the west side, the line representing the surface, and it

was understood—Q. That was referred to as being the base above which the construction of the dam was to be built? A. Yes, sir. Q. Now up to the time of your discovering that the formation of the bed of the stream was such as you have described it, and not rock, what if anything did you learn from the water and light commissioners in reference to the formation being the same or different from rock? A. I had no talk with them about it, and I learned nothing from them.

In its brief, defendant insists upon its exception to all the evidence recited above in this paragraph, number 15.

Whether there was any ambiguity in the contract is one of the questions involved and considered by us in disposing of the exception to the overruling of the motion for a directed verdict. It is unnecessary to repeat what we said in that connection; suffice it that as we understand the ruling (quoted above) of the court below, touching ambiguity in the contract, it was substantially in accordance with our views hereinbefore expressed, and without error.

The exception to the admission of the evidence shown in this paragraph (No. 15) is based upon the same general ground that if the excavation of the pocket was within the terms of the contract, (and defendant says it was,) it is immaterial what the understanding was before the contract was executed; for whatever then took place, it was merged in the written contract. In urging this objection, the defendant's position is based wholly upon its theory of the case, that the contract was unambiguous, and that the work done in the pocket was required by the provisions thereof. It takes no note of the plaintiffs' theory that the contract was ambiguous, and that the work of excavating and filling the pocket was not covered by the specifications and the contract. The rule that oral testimony is inadmissible to enlarge, vary, or contradict the terms of a valid written contract, is laid down by the authorities as elementary; and it obtains, says Professor Greenleaf, (in his work on evidence, Vol. 1, Sec. 276,) "because the contract itself is plainly and intelligibly stated, in the language of the parties, and is the best possible evidence of the intent and meaning of those who are bound by the contract, and of those who are to receive the benefit of it." But the writing is to be read in the light of surrounding circumstances, in order more perfectly to understand the intent and meaning of the parties. *Rioux* v. *Ryegate Brick*

*Co.,* 72 Vt. 148, 47 Atl. 406. And a contract is to be construed with reference to its object, so that effect may be given to the intention of the parties when ascertained. *Johnson* v. *Newfane,* 40 Vt. 9. "In order to ascertain the relation of the words of a document to facts," says Stephen in his Digest of the Law of Evidence, (Chase's Ed.,) 229, "every fact may be proved to which it refers, or may probably have been intended to refer, or which identifies any person or thing mentioned in it." Again the same author says, at page 231, "If the language of the document, though plain in itself, applies equally well to more objects than one, evidence may be given both of the circumstances of the case and of the statements made by any party to the document as to his intentions in reference to the matter to which the document relates." And when a latent ambiguity is found to exist, such evidence is not an infringement upon the spirit of the rule excluding parol evidence to enlarge, vary, or contradict a valid written contract, nor an exception to it, but on the contrary it is out of the range of its operation. 1 Greenl. Ev. Sec. 282, 295a. In *Gray* v. *Clark,* 11 Vt. 583, it was said that the term "including" in the deed there in question, was at most, in its connection, equivocal; and that in such cases resort may always be had to the circumstances under which the contract was executed, and the contemporaneous construction given it by the parties. In *Hart* v. *Hammett,* 18 Vt. 127, the written contract was for the purchase of "winter strained lamp oil." The plaintiff introduced parol evidence tending to prove that dealers in oil sometimes understand that the oil specified in the contract means *winter strained sperm lamp oil,* and that sometimes the term *winter strained lamp oil* means either *whale* or *sperm* oil. In this state of the case, subject to objection, parol evidence was introduced by the defendant to prove that he informed the plaintiff, at the time the written contract was executed, that the sample, and the oil which he was selling him, was not sperm oil, that he did not sell it to him as such, and that he could not tell him what it was. The evidence was received as tending to show in what sense the parties understood the term "winter strained lamp oil," the term used in the contract. Affirming the judgment, this Court said parol evidence is admissible to give an application of a written contract to its subject-matter, in cases in which the thing, as expressed, is applicable, indifferently, to more than

one subject; and if the intention of the parties is expressly declared, this should be regarded as far more satisfactory than to have the intention inferred; and evidence to this point can not but be material and relevant to the inquiry. In *New England Granite Works* v. *Bailey,* 69 Vt. 257, 37 Atl. 1043, by the terms of the written contract the monument was to be of *"white Westerly granite."* The monument erected was of a reddish or chocolate tinge in color. The defendant refused to accept the monument on account of its color, claiming that it must be a whiter shade to comply with the contract. The trial court found that there are different varieties of Westerly granite known among dealers as *"*white Westerly granite,*"* none of which is pure white; that the coloring material intermixed in some is of a reddish cast, which gives to the polished surface a chocolate tinge or color, and a slighter tinge or color of the same kind to the hammered surface. The plaintiff insisted that it was error to permit the defendant to show by parol evidence that at the time the contract was made it was understood and agreed by the parties that the monument should be made from the whitest variety of the white Westerly granite, the one which took a grayish rather than a reddish cast; urging that this phase of the case fell within the rule that "parol, contemporaneous evidence is inadmissible to contradict or vary the terms of a valid, written instrument." Following the holding in *Hart* v. *Hammett,* this Court said the phrase "white Westerly granite" being applicable to the granite of which the monument was built, and to that from which the defendant claimed it was to be built, it was competent to show how the parties understood the contract in this respect when it was made. In *Wead* v. *St. Johnsbury & Lake Champlain R. R. Co.,* 64 Vt. 52, 24 Atl. 364, it was held that where the owners of land conveyed it, bounding it by the east line of a highway, and there was a surveyed line of that side of the highway, also a line which was recognized as the east line of the highway, "Parol evidence was admissible, not to vary the deed, but to explain it, to show the location of the east line, to show whether the parties by the description in the deed, meant one line or the other. Where a description is equally applicable to two or more objects parol evidence is admissible to explain to which of these objects the description refers." *Ward's Admr.* v. *Preferred Accident Ins. Co.,* 80 Vt. 321, 67 Atl. 821; *White & Hammond* v. *Amsden,* 67 Vt. 1, 30 Atl. 972;

*Grout Bros.* v. *Moulton,* 79 Vt. 122, 64 Atl. 453; *Rugg* v. *Ward,* 64 Vt. 402, 23 Atl. 726. On the authorities to which reference is made, the evidence to which the exceptions under consideration were taken, was properly received.

16, 17, 18, and 19. In further direct examination, Varnum testified that during the progress of the work on the dam, inspector Slayton was present all the time, and that he saw all the commissioners, except Judge Powers, there at different times, and that they talked with him about the work. He was then asked whether he recollected anything in particular that any one of the commissioners said in reference to the work, which indicated a knowledge of what was going on, and to state which one of them made any such remark; the evidence being offered as bearing on the knowledge of the commissioners. Objection was made on the ground that defendant could not be bound by its commissioners in any way, either by a declaration or anything else, except the action be by at least a majority of them and within the scope of their agency; that knowledge had by less than a majority was immaterial. The evidence was received, and exception noted. The answer to this and other questions fairly within the exception was, that he saw and had conversation with all the commissioners, except Judge Powers, at various times, sometimes one and sometimes another, as they were on and off the works while the excavation of the pocket was going on, but he could recall a distinct conversation only with Mr. Slocum, when the latter was at the works on one occasion and stood in the highway where he could look down and see the work going on in the pocket; that Slocum then said something about the work which was going on, but his language the witness could not use. Being asked to tell the substance of it, he answered, "As nearly as I can tell it he expressed surprise at the bottom of the bed-rock going down so much below what had been expected, and at the difficulty of doing the work, and wondered when we would ever get to the bottom and get the river filled up so as to be out of danger of high water." Continuing, he testified that about half of the bulk of the excavation of the pocket had then been done. Subject to the same objection and exception, the witness further stated that he recalled another conversation which he had when Mr. Slocum and Mr. Morse were both present just after engineer McIntosh had been upon the works for two or three days, and when the ex-

cavating in the pocket was down from six to eight feet in depth; that Slocum and Morse came down and gave some directions regarding the work, which was the occasion of their being there; that they told him "that they wanted the dam built a foot thicker. In view of this being so much deeper than was on the plans and as they had expected, that it must be built a foot thicker—the concrete was to be made a foot thicker going across the stream than it had been shown on the plan, and they were down there to give directions in regard to it, together with Mr. Slayton—Mr. Slayton was usually present at any of these conversations," and was at that time—all together at the dam; that "their reason was that Mr. McIntosh thought that the depth of this pocket was such that he felt satisfied that the construction wanted a foot more concrete east of the spillway." Q. A foot thicker than the plan called for because they had to go down deeper than they expected? Objection was made to this question on the grounds that if any change in the contract was made, it should be covered by an order in writing; and that no change could be made therein except by a majority of the commissioners, and only two of them were there. The answer in substance was that they gave the order, assigning that as the reason.

Subject to exception on the grounds last stated, the witness, being asked to state the talk between him and Morse, Slocum and Slayton in regard to strengthening the dam by an extra foot in thickness, answered, "They came on the work and said that they had been considering the dam, Mr. McIntosh had been there, and that they had decided, in view of the depth to which we were going in this pocket, that they wanted the dam made a foot thicker,—a foot more concrete; that Mr. McIntosh required it; and they had considered themselves that it was not necessary to put in the trenches under the dam and backfill them with concrete as the plan called for, as the bottom of the river was rough enough to hold without trenches, and also that the blasting that they had seen in the forebay was injurious to the bed of the river, it shook the rock up, and the formation was such that they thought that better be leveled up, and that they would propose that we put in an extra foot of concrete and offset the additional expense of furnishing the concrete by the additional saving it would be to us in not having to excavate the rock trenches and backfill them with concrete."

That the evidence was properly admitted for the purpose of showing knowledge to the commissioners, of the conditions found in the pocket, there should seem to be no reasonable doubt. In *Burditt* v. *Porter,* 63 Vt. 296, 21 Atl. 955, 25 Am. St. Rep. 763, it was held that notice to one of the selectmen of the town, of an assignment of a debt against the town, was in legal effect notice to all, and to the corporation for which they acted.    The Court in that connection saying, ''The selectmen are by statute made the financial agents of the town and charged with the general supervision of its affairs.    When a notice affecting the town's liability is given to a member of the board, it is given for the town and it becomes the duty of the member notified to communicate the notice to his associates.    It is well settled that notice to an agent of a party, whose duty it is as such agent to act upon the notice, or to communicate his information to his principal in the proper discharge of his trust as such agent is legal notice to his principal.    This rule applies to the agents of corporations as well as to those of private persons.    As a general rule, notice to an agent, in the course of the transaction in which he is acting for his principal, of facts affecting the nature and character of the transaction is constructive notice to the principal.    The principal is deemed to have notice of whatever is communicated to his agent while acting as such in the transaction to which the communication relates * * * * A town can receive notice only through its officers or other agents, and it therefore becomes the duty of the agent to communicate the notice received by him to the persons who may be called upon to act with reference thereto.''    In *Whipple* v. *Village of Fair Haven,* 63 Vt. 221, 21 Atl. 533, where damages were sought for allowing the discharge of water on the orator's premises through a culvert, it was contended that the village was not liable, because the damage was occasioned by the unlawful or negligent conduct of its officers who were not its servants (but the servants of the State) when repairing highways.    But the Court said that if the culvert was obstructed by such conduct of its officers, and the village neglected after reasonable notice to remove the difficulty, it was liable; that there was notice to the village, ''for its trustees had knowledge of the fact, and it was their duty to act in respect of it, and therefore their knowledge, even though obtained when not acting as agents of the village, was notice to the village.''    Knowledge by, or notice to, an agent while acting

for his principal, of facts affecting the transaction, is constructive notice to the principal, the principal and agent, as to that transaction, being regarded for the purposes of notice as identical.   *Blumenthal* v. *Brainerd,* 38 Vt. 402, 91 Am. Dec. 349.

In connection with the exceptions on the grounds that if any change in the contract was made, it should be covered by an order in writing, and that no change could be made by less than a majority of the commissioners, it should be stated that there was no direct evidence in the case showing that any other commissioners ever authorized Slayton, Slocum, and Morse, or any of them, to make the statements above given as to the reason for adding the extra foot in thickness to the dam, nor that they ever knew that any such reason had been given therefor.   Yet from the testimony of commissioner Morse particularly hereinbefore noticed, the testimony of Varnum that before the contract was executed the plaintiffs were told by the commissioners that Slayton would have charge and be the inspector of the work continuously, and that the contractors regarded him as in charge of the work and took his orders, and that on the occasion when Morse, Slocum, and Slayton were on the works together, as stated above, all three took part in the conversation as to the reason for the extra work then ordered, and that Slayton was then actually in charge and looking after the work, and that all other orders for the extra work performed, and material furnished, were given to the plaintiffs by him, and the evidence that such extra work and materials were accepted by the commissioners without objection, the only fair inference to be drawn is, that in whatever Slayton did by way of ordering extra work and materials, or in connection therewith, he was acting as the authorized agent of the commissioners; and it is fairly inferable that in whatever commissioners Morse and Slocum did on the occasion referred to, they were representing the board, and their declarations were properly received as forming part of the *res gestae.*   The evidence was that they were on the works for the purpose of giving orders respecting work outside the specifications and the contract, namely, the addition of one foot of thickness to the dam, and their declarations in connection therewith, to which objection was made, served to show its purpose, occasion, and object, and to explain its origin and significance.   Steph. Dig. Ev. (Chase's Ev.) (8-9,) and notes; *Elkins* v. *Hamilton,* 20 Vt. 627.   Professor Greenleaf says, (1 Greenl.

Ev. 16th Ed. Sec. 184c,) "where the acts of the agent will bind the principal, there his representations, declarations, and admissions, respecting the subject-matter, will also bind him, if made at the same time, and constituting part of the *res gestae.*" And in *Grout* v. *Moulton,* cited above, it was held that statements to be a part of the *res gestae,* need not necessarily have been simultaneous with the conclusion of the contract, but only that they should have been made during the negotiations that led to the contract, have influenced the other party in making it, and entered into it as a part thereof.

The question of the requirement that extra work be covered by an order in writing, has been sufficiently discussed in connection with the motion for a verdict.

20.   Under exception on the ground of immateriality, and that the jury could as well judge about it as the witness, Varnum was permitted to testify as follows:   Q. Taking into consideration what you found out about the premises there by actual observation and being there the various times you were before you began this excavation of the pocket, and what you found the formation of the bed of the stream to be when you really got into the pocket and excavated it, tell us whether you could have discovered what those conditions were without actual experiment to determine it?   A. I could not.   Q. As a matter of fact, did you at any time from what you observed there as you went down into the pocket, have a knowledge of whereabouts the bed-rock might be until you actually struck it?   A. I did not.   As ruled by the trial court, this is one of the facts enumerated in the opinion of this Court, when the case was here before, as tending to show waiver by the defendant, of the provisions of the contract, as far as those provisions applied to the excavating and filling the pocket, and consequently it can hardly be said to be immaterial; and the position that the jury could judge of the matter as well as the witness, is manifestly too erroneous to require further consideration.

21.   Varnum testified that early in December, 1906, after the pocket had been excavated and filled, he had a talk with engineer McIntosh relative to the monthly estimate which he was then about to make; that the witness made some request of McIntosh in reference to the work done in the pocket; that the latter said he would consider it; that later the witness saw him and inquired about it, and then under exception on the ground

that McIntosh "was not the agent of the village of Morrisville whereby any declaration of his can prejudice" the village, the witness stated that McIntosh said "he had considered it." This exception is without force. The specifications provide that "So long as the work herein contracted for is prosecuted agreeably to the provisions of the contract and with such progress as may be satisfactory to the owners, the owners by their representatives will, on or about the first day of each month, make an approximate estimate of the proportionate value of the work done thereon and of the material furnished, * * * and the amount of said estimate less 15% and all previous payments, shall be due and payable to the contractor * * * on or before the 12th day of the current month. Upon the completion of the work to the satisfaction and acceptance of the owners, a final estimate of the total amount of contract and all extra work performed by the contractor by order of the owners shall be made, and this total sum, less all previous payments, shall be paid to the contractor within thirty days of date of said final estimate." The evidence showed that McIntosh, acting for the owners, was the man who was to make such estimates. If the work of excavating and filling the pocket was within the requirements of the written contract, it was the duty of McIntosh to include it in the estimate of December, 1906, which is exhibit "8". If this was "extra work performed by the contractor by order of the owner," it was not the duty of McIntosh to estimate it until the completion of the work called for by the contract. To determine whether in his judgment it was work to be included in the monthly estimate, required consideration by him. *White* v. *Central Vermont Ry. Co.*, 87 Vt. 330, 89 Atl. 618. That he did not so include it, appeared from the estimate made. His declaration to plaintiff Varnum that "he had considered it," related to, and was made in connection with, an act done in the course of his agency, and tended to characterize his act in omitting said work from the monthly estimate then being made by him. Consequently it was admissible in evidence as bearing upon the question of whether that work was within the written contract; and it was notice to him in the line of his duty, as such agent, that the contractors claimed pay therefor as extra work, and under our holding in a previous paragraph, it was in law notice of that fact to the defendant.

22.   During the cross-examination of plaintiff Varnum, he was asked whether he understood that section AB had any application to any other part of the dam, and answered in the affirmative.  He was then asked, ''Q. Now if you were to go to rock by the terms of that section AB, for the foundation, and that section applies to the rest of the spillway, why didn't you have to. go to rock along the whole length of the spillway?  A. Nothing on this page that makes any difference.  The whole plan tells me to go to rock.  The profile plan shows you find rock at the levels marked on it.''  Counsel for defendant asked to have the answer stricken from the record as not responsive, and excepted to the court's refusal so to do.  We think the answer was responsive.  The witness was asked why, on the premise stated, he did not have to do a certain thing, and he answered why, giving his reasons.

23.   In redirect examination, under exception on the ground of immateriality, the same witness stated that before making his bid, he with the aid of the plans, specifications, and view or examination made by him of the premises, carefully estimated the yardage of the work which he was to contract for.  He then testified against same exception as follows:   Q. Now in making that estimate from what points, or from what lines, to what line, did you estimate as being the height of the structure that you were to build?  A. From the line at the top of the purple on this plan, exhibit C, to the line which represents the crest of the spillway, over that part of it, and on this part outside of the headgates, that is, to the west of the headgates, or bulkhead as it has been termed, estimating from the top line as shown in the plan at the top, and to the lines shown, adding what I supposed would cover the distance from the surface of the ground to the solid rock.  This evidence was material on the question of the plaintiffs' understanding of the plans and specifications at the time of making their bid, and as bearing on the question whether the parties gave a contemporaneous construction of the contract as now claimed by the plaintiffs.  This is covered by our holdings in this case when it was here before.

24 and 25.   These exceptions were taken to the exclusion of the testimony of witnesses to show mere mathematical computations made by them, ''for the assistance of the jury.''  Without undertaking to say whether there may or may not be

cases where mathematical computations would be proper evidence, certain it is that there is nothing before us showing error in the exclusion of the computations offered in this case.

26.  Percy J. Smith, found to be an expert engineer experienced in dam construction, was called by defendant, and asked whether he knew anything about the "wash-boring" method of determining the character of the bottom of a river, to which allusion had been made by some of the witnesses, and answered, "I have read of it. I have never used it." He was then asked, Q. From your knowledge of it, state whether it is feasible to use in a locality filled with that material, (excavated from the pocket,) such as you saw in the "spoil pile" there? On objection being made by plaintiffs, the court failed to find the witness qualified to testify as an expert on that subject, and excluded the question; to which defendant excepted. Let it suffice, that it did not even appear whether the witness "read of it" in some scientific book on the subject, or in a daily newspaper or some other publication without any pretentions as to knowledge of such matters. The finding is conclusive.

27.  The same witness was asked, Q. Assuming that the profile line, so-called, on the profile figure on the fourth page of exhibit B, is the profile of the surface of the soil, where the river does not flow, and of the surface of the bottom of the river where it does flow, and that these levels are levels at those points before any work was done, what would you think of constructing a dam right on that surface as it is indicated? Objection being made, the question was amended, the last part of it to read, "what would you think of the requirement that that dam should be built along that line?" Counsel for defendant offered to show that the witness would characterize it as being very foolish, or something of that kind. The question was excluded, and exception saved. The characterization of such a requirement on the assumed facts, was not a matter for expert testimony, and the question was properly excluded.

28.  The question excluded under this exception was of the same character as the one last considered, and for the same reason its exclusion was not error.

29.  Defendant called as a witness, I. W. Jones, who was found to be an expert hydraulic engineer and designer and builder of dams. In direct examination he testified as follows: Q. Supposing, Mr. Jones, you were drafting for this dam, plans,

and you desired to make a cross-section of the spillway, so that it might tell the contractor that the spillway shall be constructed throughout its entire length, so that a line drawn through the foot of the toe and parallel to the crest of the dam, shall be 20 feet and 10 inches, and shall say to the contractor, "for the rest of that spillway you shall go to solid rock, no matter where you shall find it," you wanted to make a section that would say that, how would you construct such a section as compared with that section AB? A. The same as that. Q. Is that a common way of expressing that among engineers? A. Yes, sir. Q. Is there anything on that plan, marked "Profile across River at Dam," that indicates that that profile line is a grade line? A. Yes, sir. Q. What is there? A. There are figures given for elevations at different points. Q. You understand I am talking about this profile line, how that would be made if it was intended to be a grade line to which the foundation of that dam should be placed, or if intended for the grade line? A. Well any part going below that line would be shown by a dotted line. In cross-examination, the witness was asked, Q. Now Mr. Jones, supposing that you wanted to provide for the unexpected, would you put into your plans and specifications something about what might be discovered, and indicate something as to bids on that? Defendant objected to this question on the ground that "This examination is proceeding upon the theory of his drawing a line upon which they are to found a dam." The question was ruled to be within proper cross-examination, and permitted under exception. The witness answered, I don't know what I should do in a case like that. Q. Did you and I talk this matter over a little the other night? A. Yes, sir. Q. And did you say to me on the steps down here, that it was rulable to indicate or put into the plans and specifications that the bidder should name his price for anything below the line in case it should be found necessary? Subject to same exception, he answered, I didn't say it was rulable? Q. Well, what was the word you used? Under same exception, he answered, I said that that was my custom. The questions to which objection was made included an element, the existence of which the plaintiffs' evidence tended to show, but which was not made a part of the basis of the testimony of the witness in direct examination, namely, whether, if he wanted to provide for the unexpected, he would put into his plans and specifications something about

what might be discovered, with an indication for bids on that. The witness answered that he did not know what he should do in a case like that, but finally admitted that he told the examining attorney "the other night" that it was his custom to indicate or put into the plans and specifications something calling upon the bidder to name his price for anything below the line. should it be found necessary. This testimony in cross-examination tended to lessen the force of what the witness had stated in his examination in chief, and was therefore proper. *Stiles* v. *Estabrook*, 66 Vt. 535, 29 Atl. 961; *Foster's Exrs.* v. *Dickerson*, 64 Vt. 233, 24 Atl. 253; *Titus* v. *Gage*, 70 Vt. 13, 39 Atl. 246; *Clark* v. *Gallagher*, 74 Vt. 331, 52 Atl. 539.

30.  The bill of exceptions states that it appeared that before plaintiffs discovered the pocket they had excavated to solid rock for the foundation of that part of the spillway west thereof, and into the "handle," so-called, to the depth of at least one foot; and plaintiff Varnum testified that, even on plaintiffs' theory, they should clean off to the depth of one foot to reach solid rock. Defendant called as a witness F. H. Dewart, found to be an expert engineer familiar with the designing of dams and their construction, who testified that he had made exhibit 18 which shows how much of that part of the pocket, called during the trial, "the handle," is taken off by one foot, and by one and one-half feet excavation; that by a foot nearly all of the "handle" was taken off, and by a foot and a half, still more. Thereupon defendant offered exhibit 18, "in connection with the witness's testimony, as illustrating his testimony and making it clearer to the jury." The offer was excluded, and defendant excepted. It is sufficient to say concerning this exception, that the exhibit named has not been furnished us, and therefore the question is not considered.

31.  C. H. A. Stafford, one of the commissioners, called as a witness by defendant, testified in direct examination, that after bids were received from the different bidders, the bid of the plaintiffs was found to be the lowest, but that was more than the commissioners felt they could put into the business, and they then began to figure to see if they could not reduce the cost of the dam without impairing its efficiency, and had made certain computations which would reduce the bid of the plaintiffs provided they would agree to it, and a subsequent meeting was had with plaintiff Varnum for the purpose of

getting his consent to that change in the amount of their bid. In cross-examination, subject to exception on the grounds that it was not proper cross-examination, nor relevant to any issue in the case, the witness was permitted to testify as follows: Q. Now you have an opinion about how much the water and light commissioners were going to put the village of Morrisville to expense, have you, in the construction? A. Yes, sir, we did. Q. And now what was the cost that you thought would be the proper amount from the information that you had received? A. I think it was approximately $45,000. We think this was within the scope of cross-examination which the court, in its discretion, could allow.

32. The plaintiffs' witness George Badger testified to helping take the soundings at the site of the dam, on March 9, 1906; that the preliminary work by him was done at the request of Mr. Stafford, one of the commissioners, and Mr. Slayton, afterwards the inspector; that Stafford asked him to obtain information of one kind and another at different times; that at one time before the execution of the written contract here involved, he saw an engineer, Mr. McIntosh, in Burlington, at Stafford's request,—all as bearing upon the question of Badger's interest at the time of such preliminary work. In direct examination Mr. Stafford testified that he "never understood that Mr. Badger had any connection (with the preliminary survey and exploration in the case) except at his own request;" that the witness never requested him to act on behalf of the village of Morrisville in any sense; that he probably had some talk with Badger, but the latter never went to Burlington, to some engineer, at witness's request; that neither he, nor any of the other commissioners to his knowledge, requested Badger to take any part or go anywhere in connection with such preliminary work. In cross-examination the witness testified that he did not know of his own knowledge whether Badger went to Burlington. He was then asked if he knew through Mr. Slayton as to whether or not Badger went to Burlington. This was objected to as not cross-examination, and incompetent. It was permitted as cross-examination, and exception saved. He answered in the affirmative. Q. It is your understanding that Mr. Badger was at Burlington, isn't it? Subject to same objection, answered that it was. We think that in view of the testimony of the witness that he "never understood that Mr. Badger had any connection"

with such preliminary work, "except at his own request," an inquiry as to his understanding could be permitted in cross-examination, within the bounds that it was carried, and that, as bearing upon his understanding, he was properly asked if he knew through Mr. Slayton whether Badger went to Burlington.

33. In rebuttal, during the redirect examination of plaintiffs' witness George Badger, and referring to the interview in the office at Morrisville, before the contract was executed, when the witness, plaintiff Varnum, and all the commissioners, except Judge Powers, were present, the witness testified (under exception as not admissible in any view) that he could not tell just what was said by any one; and being asked to tell the substance of what any of the commissioners said, telling what he heard as nearly as he could, continued as follows: "The plan with the elevations marked on it for the bed of the river, indicated rock-bottom in the bed of the river for the foundation of the dam. Q. Now in that same connection if anything was said as to the means of knowledge that the person talking had as to what the bottom was, you tell us what was said about that? A. I think that was fully discussed, and I referred that to Mr. Varnum myself, in the presence of the others there, as well as the other people present. Q. Tell us what you said to Mr. Varnum in the presence of all those people at the meeting? If it was in their presence and hearing, was it? A. Yes. Q. Now tell us. A. We were looking over the plan together—I told him about the soundings being taken, and how often they were taken, and what was indicated to the best of my knowledge by the soundings."

It is argued that this redirect examination was not warranted by the cross-examination; but this is of no consequence. The transcript fairly shows that the court recognized that fact, and admitted the evidence out of the ordinary course, in its discretion. The question here raised as to the admissibility of the evidence is the same in legal effect as the one hereinbefore (under exception 15) discussed by us at length with reference to authorities, and nothing need be added to what is there said, in holding this exception not well taken.

## IX. Requests to Charge.

Defendant submitted thirty-eight requests to charge, and with requests numbered, respectively, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10,

11, 12, 15, 18, 19, 20, 21, 22, 23, 24, 25, 26, and 28, there was a failure to comply, except as otherwise hereinafter stated, and to each such failure defendant severally excepted. The questions raised by requests 1, 2, 3, 22, 23, 24, 25, 26, and 28, are in effect presented and determined upon the motion for a directed verdict, and need not be further noticed.

Evidence was introduced showing what was done by the contractors in building the dam west of the bulkhead, and what was there found. What the contractors did there by way of excavating for the dam, was not determinative of any issue in the case, and there was no occasion for the court to single out that feature as evidence and make it prominent in the charge. For this reason the fourth request was properly refused; and for a similar reason, the fifth and sixth requests also. *Vaillancourt* v. *Grand Trunk Ry. Co.,* 82 Vt. 416, 74 Atl. 99.

The seventh request reads: ''The written contract of July 2, 1906, and the plans and specifications thereunder, cannot be construed so as to require the foundation of the spillway to be placed on that section of the 'profile line' that is below the water level at the elevations indicated on that section of said 'profile line,' and not make the corresponding requirement for the foundations of that part of the spillway that should be built along that portion of said 'profile line,' that is above the water level.'' But as before observed, the contract expressly provides that ''The work shall be performed according to the plans and drawings,'' and not under the terms and conditions of the specifications. Hence the question was not whether the written contract, ''and the plans and specifications thereunder,'' could or could not be construed so as to require the foundation of the spillway to be placed on that section of the profile line, etc. The requirement as to the foundation in this regard was to be found in the ''plans and drawings.'' For this reason, if for no other, the refusal of the request was not error. This holding applies as well to the nineteenth request, since it contains the same element of unsoundness.

The eighth and ninth requests were in legal effect similar: ''No act or omission of the plaintiffs, or either of them, or of Mr. Badger, done or omitted in the construction of the dam, or in the excavating and filling of the 'pocket' after the execution of the written contract * * * can be evidence in favor of the plaintiffs,'' (the eighth) ''touching the force, effect, or con-

struction of the written contract * * * or the plans and specifications thereunder"; (the ninth) "as to their understanding of the force, effect, and interpretation, or legal effect of said contract and the plans and specifications thereunder." A compliance with these requests would have deprived the plaintiffs of the benefit of much evidence of the character named, tending to show how the parties understood the contract, and their practical construction of it. They were rightly refused. *Barker* v. *Troy & Rutland R. Co.*, 27 Vt. 766; *Vermont & Canada R. Co.* v. *Vermont Central R. Co.*, 34 Vt. 1; *White* v. *Amsden*, 67 Vt. 1, 30 Atl. 972; *Kopper* v. *Fulton*, 71 Vt. 211, 44 Atl. 92. In *District of Columbia* v. *Gallaher*, 124 U. S. 505, 31 L. ed. 526, 8 Sup. Ct. 585, contractors sought to recover in part for extra work and materials furnished by them, beyond the requirements of their contract for building and completing a brick arch, as set out and described in the contract and specifications. The controversy arose out of the fact that the letter of the contract and specifications did not correspond with the plan of the work as furnished by the engineer and the sample of the work which had been done previously by other contractors, and with which that of the present claimants was to connect. The work as actually done was done under the direction and supervision of the district engineer and was performed in accordance with the plan and sample which was supposed and understood to be what was required by the contract, and to be paid for at the contract price. The court said, "We think that the practical construction which the parties put upon the terms of their own contract, and according to which work was done, must prevail over the literal meaning of the contract, according to which the defendant seeks to obtain a deduction in the contract price."

The tenth, eleventh, and twelfth requests are considered together. By the tenth, the court was asked to charge that there was no evidence in the case tending to show that Slayton, the inspector, had any authority to bind defendant by ordering the doing of any work, or the furnishing of any material, outside of that required by the written contract and the plans and specifications thereunder, and for which plaintiffs would be entitled to pay beyond the sum stipulated in said contract as payment for the whole work. In legal effect, the twelfth request was similar. By the eleventh, a charge was requested that any

notice to Slayton by the plaintiffs that they understood that in excavating and filling the pocket they were doing work for which they expected pay beyond the stipulated sum for the whole work, would not be notice to defendant. We have already discussed the question of Slayton's agency, both on the evidence and on the law. We have also discussed the law by which notice to an agent is constructive notice to his principal. And it is sufficient here to say that, in view of the evidence, the legal questions raised by these three requests, could not properly be ruled as requested.

The fifteenth request was: "If, during all the time that elapsed from the time when the existence of the 'pocket' first became known till it was finally excavated and filled, a majority of the water and light commissioners of the village of Morrisville honestly believed that the written contract of July 2, 1906, and the plans and specifications thereunder, required plaintiffs to excavate and fill the pocket as they did, then there was no waiver of the requirement of said written contract that extra should be covered by a written order."

The question of the waiver of the provision of the contract, requiring a *written* order for extra work and materials, in order to entitle the contractors to pay therefor, was raised by the motion for a verdict. In disposing of the question in that connection, we held that the evidence was sufficient to justify a finding of a general waiver, an intentional relinquishment altogether, of that provision. Since on the evidence the jury might find the fact of such general waiver, if they did find it, (and the verdict shows that they did,) the provision necessitating a *written* order would in effect be eliminated from the contract as to any and all such work and materials, whether it be by way of excavating and filling the pocket or otherwise. In such circumstances, the work in the pocket being ordered by defendant and performed by the plaintiffs, if in fact it was not within the requirements of the written contract, the latter are entitled to pay therefor, even though the commissioners believed at the time that it was within those requirements. *Trow* v. *Forsyth,* 70 Vt. 498, 41 Atl. 501. For this reason the request was properly ignored. It seems, however, that the court undertook to cover this feature of the case in its charge, and did in a manner not excepted to as follows: "If, however, you find by a fair balance of the evidence that the excavation and filling of

this pocket was extra work and material, and that the same was performed and furnished by the plaintiffs, and that after the same was completed that the dam was delivered to the defendant who accepted the same knowing that it was extra work and material furnished by the plaintiffs in the necessary construction of the dam, or that the defendant in the exercise of the care and prudence of a prudent man ought to have known it, and knew that the work had been performed and the material furnished without any written order from the defendant or its representatives, then the plaintiffs may recover upon this branch of their specifications if the other elements in the case are made out, notwithstanding that there was no order in writing from the defendant or its representatives for such work and material.''

By the eighteenth request the court was asked to charge the jury that ''If plaintiffs rely on the conduct and silence of Mr. Slayton from day to day, as the work of excavating and filling the 'pocket' progressed, to constitute a waiver by defendant of the requirement of said written contract, and the specifications thereunder, so far as concerns the work of excavating and filling the 'pocket', then the burden is on the plaintiffs to satisfy the jury by a fair balance of the evidence'' that certain things were so and so. It is quite enough to say in holding this request unsound, that there was much other evidence on the question, and the plaintiffs did not rely solely upon the conduct and silence of Slayton to constitute such waiver. It was the right of the plaintiffs to have the jury determine the question of waiver upon the whole evidence bearing thereon. *Thornton's Executors* v. *Thornton's Heirs*, 39 Vt. 122; *Ashley* v. *Hendee*, 56 Vt. 209; *Sherwin* v. *Rutland R. Co.*, 74 Vt. 1, 51 Atl. 1089; *Foster's Exrs.* v. *Dickerson*, 64 Vt. 233, 24 Atl. 253; *Boyden* v. *Fitchburg R. Co.*, 72 Vt. 89, 47 Atl. 409.

The twentieth and the twenty-first requests include the element of a misunderstanding of the requirements of the written contract, and the plans and specifications, by the plaintiffs; but no such claim was made by the plaintiffs, and there was no such issue in the case. The parties disagreed as to the proper interpretation in certain respects, and in those respects the contract was held to be ambiguous. On evidence introduced, certain facts affecting the construction were left to the determination of the jury, the construction to be according as those facts should be found. The verdict shows conclusively that they were

found as claimed by the plaintiffs. The refusal of requests embodying general propositions of law, however correct in form and substance, not involved in the case on trial, is not error. *Winn* v. *Rutland*, 52 Vt. 481; *Smith* v. *Central Vermont R. Co.*, 80 Vt. 208, 67 Atl. 535.

## X. EXCEPTIONS TO THE CHARGE AS GIVEN.

Six exceptions were taken to the charge. The legal questions presented by the first, second, and third of these, have been fully considered in connection with the motion for a verdict. The holdings there render these exceptions without avail.

Fourth exception. After stating to the jury the claims of the respective parties in a manner satisfactory to both, and also stating that "Both parties concede that it was impossible to build the dam upon the lines and levels shown on the plans and drawings as claimed by the plaintiffs, and at the same time construct the dam upon solid rock; neither do they claim that it could be built on solid rock and at the same time be built no lower than the levels claimed by the plaintiffs, or, in other words, without going below the point represented by the purple line on plaintiffs' exhibit C, which line is intended to represent the top of the discovered pocket, but the defendant claims that the lines and levels referred to in the contract were intended by the parties to cover only those levels at the top of the dam, to which it was to be built and did not extend to all the figures and to all the lines and levels as claimed by the plaintiffs and shown in the plans, including those below the top of the dam as well as those at the top. We, therefore, submit to you the question, did the parties believe the bed of the river to be rock suitable for a dam to be constructed thereon, understanding that all the lines and levels as claimed by the plaintiffs shown in the plan which is referred to as a part of the contract, were to be considered in locating the foundation of the dam, and did they so intend when they executed the contract? Or did they understand that the lines and levels used in the specifications, referred only to the height to which the dam was to be built, as claimed by the defendant, and that the foundation of the dam was to be put upon the solid rock whenever found, without regard to the lines and levels except as to the top of the dam?" The exception was to the part of the charge submitting this question.

The fifth exception was in effect to the propriety of submitting any question at all to the jury, in connection with the construction of the contract. Disposing of these two exceptions together, we think the question submitted was one of law and fact affecting the construction of the contract, and consequently was for the jury to determine under proper instructions from the court; and we see no reason why it was not done in a manner fully to protect the rights of both parties. In *Roberts* v. *Button,* 14 Vt. 195, this Court said, ''It is true, doubtless, where, in a written contract, equivocal terms were used, which the court would construe as importing a personal undertaking, with reference to one state of circumstances, and the contrary, in a different state of the surrounding facts, and the testimony conflicts in regard to the circumstances attending the contract and affecting the construction of the terms used, the question of intention, with proper instructions, must go to the jury.'' In *Kenyon* v. *Knights Templar Ass'n.,* 122 N. Y. 247, 25 N. E. 299, it was said that while as a general rule the construction of a written instrument is a question of law for the court, yet ''when the language employed is not free from ambiguity, or when it is equivocal and its interpretation depends upon the sense in which the words were used in view of the subject to which they relate, the relation of the parties and the surrounding circumstances properly applicable to it, the intent of the parties becomes a matter of inquiry, and the interpretation of the language used by them is a mixed question of law and fact.''

The sixth exception to the charge was ''To the failure of the court to instruct the jury, in connection with its instruction about acceptance, that the mere use and beneficial enjoyment of the dam by defendant could not of itself constitute an acceptance.'' The court charged in this respect that ''In order to find that the defendant has accepted the work as fully performed, it must appear by a fair balance of the evidence in the case that the defendant has taken the possession and use of the dam with the intention of relinquishing all claim upon the plaintiffs for failure to perform in full.'' In effect the instructions given did tell the jury all that this exception says they ought to have been told, and more too in favor of the defence. Defendant can take nothing by this exception.

*Judgment affirmed.*

TAYLOR, dissenting. I am unable to bring myself to the view entertained by the majority as to the crucial question in this case, viz.: Whether there is such an ambiguity in the contract as opens the door to parol evidence of the intention of the parties. I purpose briefly to state my position on this question alone.

The majority hold that no ambiguity appears on the face of the contract, but adopt the plaintiffs' claim that a latent ambiguity was raised by extrinsic evidence in the provision of the specifications that "the lump sum bid must cover the total expense of securing a proper foundation and building the work specified to the lines and levels and in the manner called for in the specifications." It is said that the ambiguity consists in the equivocal or uncertain meaning of the phrase "to the lines and levels called for in the plans." It is important to a clear understanding of this matter to observe just how the claimed ambiguity arises.

On one page of the plans referred to is shown what is there called "Profile Across River at Dam." As the words indicate, this is nothing more nor less than a representation of the surface of the ground at the site of the proposed dam. It was not claimed that it purported in any sense to be a plan of the dam. It was conceded that all the earth and much solid rock below the profile line had to be excavated to prepare the site for the dam called for elsewhere in the plans. When excavations were being made to secure a proper foundation for the dam, a pocket was discovered filled with loose stones and silt in the bed of the river extending in places below the line indicated in the profile which had to be excavated and filled with concrete in order to build a dam. Without this the structure would have been worthless as such. Experts were found who were willing to testify, and were permitted to do so under defendant's exception, in substance that the words "lines and levels called for in the plans" included, as the lower limit of the structure, this profile line. Some of the same witnesses also testified under defendant's exception in effect that it was their opinion that the profile line where it crossed the bed of the river indicated solid rock; and this, though it was admitted that the line did not indicate rock elsewhere. On this evidence the court below held that there was an ambiguity in the contract and opened the

door for a protracted trial on the construction of the contract. I am unable to agree with the majority that this was not error.

If there was any uncertainty in the contract, it did not arise from the state of the subject-matter but rather from the terms used in the contract; so according to the distinction made by Judge Redfield in *Patch* v. *Keeler*, 28 Vt. 332, it was not a latent but a patent ambiguity due to the alleged double meaning of the language. Speaking of such an ambiguity, Wright, J., in *Committee of Bankers* v. *Commissioners of Revenue*, 1 Q. B. 222, says: "If there be an ambiguity which is not latent but patent, according to the old distinction, that is not a matter to be solved by evidence as to the meaning of the parties—it is to be solved by the court as a matter of construction." See Beal on Inter. 84, 134-5; also Wigmore on Extrin. Ev. §§200, 201. The distinction between latent and patent ambiguities is not always closely observed in the cases. Some can be found that seem to extend the inquiry as far in one case as the other. However, the distinction is important if the courts are to retain the function of interpreting written contracts. But without reference to this distinction, I maintain that on any reasonable interpretation of this contract there is no ambiguity, latent or patent, that permits the taking of parol evidence of the intention of the parties in aid of construction, and that the court below should have so held. Grant, if you will, that the words "lines and levels called for in the plans," taken alone, are capable of the interpretation placed upon them by plaintiffs' witnesses,—though to my mind they are wholly incapable of any such meaning even through the utmost stretch of imagination,—it by no means follows that by any reasonable construction of the whole instrument it can be said that the parties contracted with any other intention than that plaintiffs should go to solid rock for the foundation of the dam throughout its entire length.

I apprehend there can be no doubt as to soundness of the following propositions: The intent of the parties as expressed in the written contract is controlling. Presumptively their intent is expressed by the natural and ordinary meaning of the language employed, and such meaning cannot be perverted or destroyed through construction. When the parties by their words have left no fair room for doubt there is no just or defensible excuse for the admission of extraneous evidence in aid

of construction. It is the duty of the court to give effect, if possible, to all the terms of an agreement; and fair construction has to be made upon consideration of the whole instrument and cannot be based upon a single clause or expression contained therein. Where separate parts of a contract which are apparently inconsistent may be reconciled upon any reasonable construction, that interpretation must be given; for it cannot be assumed that the parties intended to insert inconsistent and repugnant provisions. Tested by these well recognized principles the contract here does not require nor admit of parol evidence to determine the intention of the parties.

Looking at the whole contract we find that in immediate connection with the words said to be ambiguous it is provided that "the lump sum bid must cover the total expense of securing a proper foundation." I can conceive of no more emphatic language nor words better calculated to set at rest for all time the question from what point the plaintiffs were to begin the work specified in the contract. Read in connection with this it seems to me the only possible meaning of the words "to the lines and levels called for in the plans" is to the lines above the foundation and to the levels, meaning elevations, shown in the plan. But that is not all. Other portions of the contract add to what was already certain. The plaintiffs are repeatedly admonished that they are to take the site for the dam as they find it. As a part of the same paragraph containing the language already quoted it is provided that "No estimates of quantities will be furnished by the owner but the contractor must examine the plans and specifications, comparing them with the site, and the lump sum bid" etc. Further on, referring to the excavating that the contractor engages to do, it is provided,

"Excavation will include * * * the removal of all earth and rock, and a sufficient amount, to secure two trenches in solid rock, as shown on drawing, for foundation for the dam."

What security is there in written contracts if an agreement prepared with as much apparent care as the one before us can be thrown open by the testimony of some witness that a single phrase of the contract taken from its context has in his opinion a meaning which is impossible when read in the light of the entire contract? Being convinced that the doctrine on which this case turns is a complete renunciation by the court of its important function of construing written contracts and that it

opens the door for interminable litigation, I am constrained to record this protest. It would be unprofitable to follow the question through the large number of exceptions that are affected by it. The course of the trial was largely influenced by the ruling and many exceptions stand or fall as the main question is decided. The question of estoppel was in the case; but whether the accredited representatives of the defendant made such representations as to the condition of the river bed at the place where the pocket was discovered, or so conducted themselves after its discovery, as to estop the defendant from asserting its rights under the contract, presents an entirely different question. If the defendant was not estopped, it was entitled to a verdict on the main issue in the case.

MUNSON, C. J., concurs in this dissent.